## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF KANSAS

**Justin Spiehs**

                          Plaintiff

v.

**Anthony Lewis,** in his individual capacity as  Superintendent of Schools for Lawrence USD 497 School District
*

**Alyse Donnell,** in her individual capacity as Board Clerk and Assistant to the Superintendent of Schools for Lawrence USD 497 School District
*

**Kelly Jones,** in her individual capacity as  USD 497 member of the Board of Education the Lawrence Kansas School District
*

**Shannon Kimball**, in her individual capacity as  USD 497 member of the Board of Education the Lawrence Kansas School District
*

**Carole Cadue-Blackwood**, in her individual capacity as  USD 497 member of the Board of Education the Lawrence Kansas School District
*

**Paula Vann**, in her individual capacity as  USD 497 member of the Board of Education the Lawrence Kansas School District
*

**GR Gordon-Ross**, in his individual capacity as  USD 497 member of the Board of Education the Lawrence Kansas School District
*

**Unified School District No. 497, Douglas County, Kansas**

Case No. 5:23-cv-04121-TC-GEB

1

\*

**Erica Hill**, in her individual capacity as USD 497 President of the Board of Education the Lawrence Kansas School District,

\*

**Paula Smith**, in her individual capacity as USD 497 member of the Board of Education the Lawrence Kansas School District

\*

**Andrew Nussbaum**, in his individual capacity as USD 497 member of the Board of Education the Lawrence Kansas School District

\*

**Kay Emerson**, in her individual capacity as USD 497 member of the Board of Education the Lawrence Kansas School District

Defendants

## AMENDED VERIFIED COMPLAINT

### −INTRODUCTION−

#### A

A remnant of the masking psychosis from the Covid-19 paranoia is on full display in this lawsuit. Americans experienced "the greatest intrusions on civil liberties in the peacetime history of this country." *Arizona v. Mayorkas*, 143 S.Ct. 1312, 1314 (2023) (Gorsuch, J., concurring). The plaintiff Dr. Spiehs offended the Superintendent of Lawrence Schools Anthony Lewis many times over by daily protest over masks at his office and by not wearing a mask (because wearing a mask exacerbated his medical conditions he was being treated for) to a public event occurring at Lawrence High School over two years ago – October 26, 2021 to be precise. But that school mask mandate died 4 months later on March 7, 2022 – with a very good scientific basis that

2

masking was ineffective and harmful to students. But as a result of Dr. Spiehs' protests and that one-time occurrence, the defendant Lewis has diagnosed Dr. Spiehs with a critical-analysis leprosy – one that must be forever quarantined. For that, defendant Lewis decrees from his righteous governmental altar, and with the full approval of the government board members, that Dr. Spiehs shalt not step foot on USD 497 property ever again on any day of the week – night or day.

**B**

This eternal confinement from the USD 497 property is a punishing viewpoint retaliatory act designed to give effect to defendant Lewis' personally inscribed scarlet letter upon Dr. Spiehs. This defendant superintendent and his Lawrence School Board so much eschew Dr. Spiehs' critical viewpoints and what he physically represents that they have permanently banned Dr. Spiehs from USD 497 property for over two years and counting. And why? Over a mask issue that even the school board did not enforce as to Dr. Spiehs when he appeared and spoke at board meetings in 2021? This permanent ban means that, unlike other persons, Dr. Spiehs cannot ever attend any church services located in Lawrence school buildings on Sunday. It also means that, unlike other people, Dr. Spiehs is forever banned from physically attending open meetings conducted in non-school hours by the Lawrence school board.

**C**

Unlike other people, the defendants then limit Dr. Spiehs to a WebEx connection for the open meetings where the president of the School Board, upon not liking Dr. Spiehs' comments, then does not merely mute the connection but removes Dr. Spiehs entirely from the connection. The school board has consequently banned Dr. Spiehs from the WebEx connection as additional punishment for his views.

**D**

The school board allows positive comments at its public comment sections of its open meetings regarding staff and students.  It also allowed parents to provide extremely private and personal medical information about students. But it will not allow even neutral comments by Dr. Spiehs about Superintendent Anthony Lewis' salary or his job searches.  The Board will not permit Dr. Spiehs to say anything the Board considers embarrassing or negative about staff and students.

**E**

Government bans on criticism are not neutral merely because they discriminate against all critiques equally.  Even when a law "evenhandedly prohibits disparagement of all groups" it can still be an unconstitutional restriction on speech. The point is not that the government is censoring particular criticisms; it's that the government is censoring critique at all.  Publicly airing criticisms of particular government employees is necessary.  It does not matter that the Board provides alternative procedures for handling "complaints" (negative comments) about staff or students.  Administrative procedures out of the public eye are not a substitute for public debate. Nothing in USD 497's Board's administrative policies concerning a "complaint" process indicates that matters raised therein will be addressed publicly

or otherwise brought to the attention of the community. Instead, those negative comments (complaints) are processed through various levels of school administrators. That process might, therefore, provide a means of resolving disputes, but it does not offer any opportunity for public debate.

**F**

The Lawrence School Board has content-based restrictions regarding speech, as demonstrated in its application to Dr. Justin Spiehs speech.  Those restrictions are not reasonable – if the government opens a forum for discussion, it cannot undermine that discussion by excluding otherwise relevant speech. Both rules serve the same goal: Preventing the government from manipulating debate by setting up an ostensibly free and fair discussion that turns out to be neither.

**G**

That's one problem presented in this lawsuit. The Boards' public comment restrictions directed towards Dr. Spiehs violate both restrictions on regulating speech at the Board's public comments section during its open meetings. But in doing so, it exemplifies why: A forum to discuss education policy in which speakers cannot express the view that certain government officials bear responsibility for the school district's failures (or successes) is exactly the kind of artificial public debate the First Amendment forbids. Those attending or tuning in by YOUTUBE to hear opinions about the school district will wrongly conclude that the public has little to say about the individuals in charge such as school superintendent Anthony Lewis. And so government officials at USD 497 have created the veneer of a robust debate while avoiding the criticism and accountability the First Amendment protects.

**H**

Superintendent Lewis' Old Testament Leviticus 13:45 imprint upon Dr. Spiehs as "unclean" is not only vindictive but an affront to the public. Protecting rights to free speech is *ipso facto* in the interest of the general public.

## JURISDICTION AND VENUE

1. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

3. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

## THE PARTIES

4. Plaintiff Justin Spiehs is a natural person, citizen of Kansas, and legal resident of Johnson County, Kansas. Dr. Spiehs has a doctorate degree in Lifespan Human Development and a Masters in Marriage and Family Therapy.

5. Defendant Anthony Lewis is a natural person who was hired by the Board of Education for the Lawrence Kansas School District as Superintendent of Schools for Lawrence USD 497 School District. He is sued in his individual capacity.

6. Alyse Donnell is Clerk of the Lawrence Board of Education and is also the Assistant to the Superintendent Lewis. Defendant Donnell is sued in her individual capacity.

7. Kelly Jones, is a current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Jones is sued in her individual capacity.

8. Shannon Kimball, is a current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Kimball is sued in her individual capacity.

9. Carole Cadue-Blackwood is a current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Blackwood is sued in her individual capacity.

10. Paula Vann is a current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Vann is sued in her individual capacity.

11. GR Gordon-Ross is a current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Ross is sued in his individual capacity.

12. Unified School District No. 497, Douglas County, Kansas (USD 497). USD 497 is a school district in Douglas County, Kansas.

13. Erica Hill, is a former USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Hill was formerly the President of the School Board. Defendant Hill is sued in her individual capacity.

14. Paula Smith is a USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Smith is sued in her individual capacity.

15. Andrew Nussbaum was a USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Nussbaum is sued in his individual capacity.

16. Kay Emerson was a USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Emerson is sued in her individual capacity.

## FACTS

17. USD 497 school district is governed by the Board of Education for USD 497 which conducts its meetings open to the public.

18. During its regular meetings, the Board receives reports and other information from USD 497 employees, including the superintendent Anthony Lewis.

19. School administrators regularly recognize employees by name during public portions of the Board's open meetings.

20. The Board provides time for public comments at its regular meetings.

21. The Board has adopted a policy that restricts what citizens can talk about during the public-comment period, which it calls the BCBI policy.

22. The Board gives the Board president discretion to decide whether or not comments violate the Board's policy.

23. Under the defendant Lawrence School Board Policy Manual, Section B - School Board Operations, Code BCAE, it states:

> BCAE - Public Hearings
> The board of education may hold public hearings on matters which the board deems appropriate. The board will normally hold public hearings before acting to change attendance center boundaries or holding a bond election.
> Kansas statute requires a hearing when closing school buildings.
> Public hearings will be held at a convenient time and a suitable place. The board may hold more than one (1) hearing at different times and places.
> The board will determine who shall preside at such hearings and will request every participant to state his name, residence, and purpose for speaking. The procedure governing public participation at board meetings is found in Board Policy BCBI.

24. The BCAE specifically states that the "procedure governing public participation at board meetings is found in Board Policy BCBI."

25. Under Lawrence School Board Policy Manual Policy  B, School Board Operations, Public Participation, Code BCBI, it references the Kansas Open Meetings Act (KOMA), KSA 75-4317. BCBI states the following:

BCBI - Public Participation

The general public will be invited to attend all board meetings, except executive sessions. At each meeting of the board, the president or the presiding officer of the board shall welcome all visitors to the board meeting.

At each regular board meeting, the agenda may include a time for public comment. During that time, the board president or presiding officer may invite to speak those patrons who have requested in advance to participate in the public comment period. The rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself. The board president or presiding officer may impose a limit on the time a visitor may have to address the board and the total time devoted to public comment at any given meeting. The board president may ask groups with the same special interest to appoint a spokesperson to deliver the group's message. Except to ask clarifying questions, board members shall not interact with speakers during public comment.

Board work sessions and board-appointed committees meet for a specific purpose or for the completion of a previously scheduled agenda. These are open meetings at which the public is welcome. Time for public comment at these meetings is at the discretion of the chairperson or at the direction of the board.

Written public comment may be submitted to the board at any time.

26. A Board president has communicated verbally and by their practices that compliments and congratulations to employees are welcome and allowed at its open meetings.

27. There are videos of every open meeting since January 1, 2021. The "video recordings speak for themselves." *Culver v. Armstrong*, Case No. 14-CV-012, 2015 U.S. Dist. LEXIS 180491, at *12 (D. Wyo. Apr. 30, 2015).

28. The defendant board member president never stopped a speaker for making positive comments about students or staff at the Board's open meetings.

29. The Board instituted its own mask policy for public meetings on or about July 2021 and when Dr. Spiehs appeared and spoke at the Board meetings during that mask mandate he did not wear a mask yet the Board President did not prevent him from attending or speaking at those open meetings.

30. In 2022, the clerk of the Board provided the following form to individuals seeking to make public comments at open meetings conducted by the Lawrence School Board:



### LAWRENCE
Public Schools

USD 497 Board of Education
**Public Comment Form**

**INSTRUCTIONS:**
<u>Please read the information below.</u> Complete the form and give it to the communications director. The board president will collect the forms. This information will assist in keeping an official record of individuals who comment during meetings. It will also assist the board and staff members in responding to questions and issues that arise during audience participation. Thank you!

**PROCEDURES:**
The board president will invite comment on topics <u>not</u> included on the agenda at the beginning of each meeting. Comments relating to agenda items are welcomed after the board has had the opportunity to discuss the topic. **Please limit comments to 3 minutes.**

**NAME:**
_____

**ADDRESS:**___
_____
_____

**EMAIL:**_____            **PHONE:**____
_____

**GROUP/SCHOOL AFFILIATION:**_____
_____

**TOPIC YOU WISH TO DISCUSS:**___
_____

### PUBLIC COMMENTARY (Pursuant to Board Policy BCBI)

The USD 497 Board of Education welcomes public comments and thanks you for taking time to talk to us about our policies and procedures. We set aside this time during our regular meetings to hear from the public.

**This is your time to share your opinions. However, complaints about specific staff or students will be heard by the board in executive session in order to protect the privacy of the individuals to be discussed.**

While you are not required to share your contact information, we ask for that information so district staff or the board can follow up with any specific concerns you may have.

Please limit your comments to 3 minutes. Thank you.

## FIRST CAUSE OF ACTION
## Violation of Plaintiff's First Amendment Right to Freedom of Speech
## Retaliation
## (42 U.S.C. § 1983)

31. Plaintiff Dr. Spiehs repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

32. Defendant Lawrence School Board chooses to conduct its open public meetings on USD 497 school district property. The defendant School Board provides for public comments at these school board meetings conducted as open meetings.

33. Defendant Lawrence School Board is not required by any law to conduct its open public meetings on USD 497 school district property.

34. Defendant Superintendent Anthony Lewis is well aware that the Lawrence School Board conducts its open meetings on USD 497 school district property.

35. Defendant Lewis was aware that permanently banning Dr. Spiehs from entering USD 497 property had the effect of prohibiting or altogether banning Dr. Spiehs from attending or speaking at the open meetings conducted by the Lawrence School Board or in church services conducted on Sundays in the same manner as other individuals.

36. There is no authority provided in any of the defendant Lawrence School Board policies in 2021 or 2022 to interrupt a speaker during public commentary.

37. There is no authority provided in any of the defendant Lawrence School Board policies in 2021 or 2022 to limit the scope of a public speaker's topic or speech.

38. There is no authority provided in any of the defendant Lawrence School Board policies in 2021 or 2022 to give authority to defendant Lewis to ban individuals from attending open meetings conducted by the defendant Board of Education.

39. There is no authority provided in any of the defendant Lawrence School Board policies in 2021 or 2022 that provides for removal of a speaker at an open meeting conducted by the Board.

40. There is no authority provided in any of the defendant Lawrence School Board policies in 2021 or 2022 that provides for removal of a speaker at an open meeting conducted by the Board because of the President's perceived speech-code violation by that speaker.

41. Persons physically attending these school board meetings can associate with other individuals attending, speak with a person publicly or privately during those meetings, as well as view the crowd, each speaker, and each board member's conduct and reactions to the public comments.

42. On or about July 27, 2021 USD 497 instituted a masking requirement for persons on USD 497 property.  The requirement exempted person  on USD 497 property when "outside, while eating, or during designated mask breaks."

43. Plaintiff Dr. Spiehs and his female friend Sue Herynk appeared at public presentation located at Lawrence High School, which is a part of USD 497 property, on October 26, 2021. Neither Dr. Spiehs nor Mrs. Herynk were wearing a mask. Dr. Spiehs did not commit violence against anyone nor had he threatened to do so at the October 26, 2021, event.

44. Defendant Lewis instructed Lawrence police to remove Dr. Spiehs and Mrs. Herynk from the High School. Dr. Spiehs possessed a doctor's note medically stating

Dr. Spiehs should not wear a mask which defendant Lewis and the police were aware of.

45. Defendant Lewis then instructed Lawrence Kansas police that Dr. Spiehs was being given a lifetime permanent ban not only from Lawrence High School but from all USD 497 property because Plaintiff did not wear a mask.

46. Dr. Spiehs' friend who also appeared at the meeting did not receive any trespass warning or any ban on appearing on USD 497 property.

47. On October 27, 2021, Mrs. Herynk left a voice message to Superintendent Lewis requesting a written explanation of the trespass ban given at the Lawrence High School the previous day.

48. Mrs. Herynk then emailed Superintendent Lewis stating "Dr. Lewis, Earlier this morning a voice message was left with your assistant, by myself, asking for a written explanation of the ban placed last night at LHS. In writing please explain the length and any other terms of this ban (which I know of only from the police) as well as the authority from which it is derived. Thank you."

49. Superintendent Lewis responded by email on October 29, 2021, stating "There has not been a ban issued for you."

50. One effect of the ban was to prohibit Dr. Spiehs from setting foot on any USD 497 property during the day – property where students or anyone might or might not be occupying.

51. Another effect was that Dr. Spiehs could not enter upon outside property of USD 497 where masks were never required in the first instance.

14

52. Another effect of defendant Lewis' ban was to prohibit Dr. Spiehs from personally attending any public events constituting public or limited public forums at any school property during the day or evening. It categorically prohibited Dr. Spiehs from personally attending any school board meetings (day or evening).

53. Defendant Lewis' ban, based upon a onetime mask violation, then and now, was unreasonable and was not and is not necessary to maintain order at every USD 497 owned property.

54. Dr. Spiehs presents no public safety concern to any member of the public regarding his onetime refusal to wear a mask in October 2021.

55. The ban prohibited Dr. Spiehs from redressing government, his speech, and from associating with those personally attending those events and meetings.

56. USD 497 ended its mask mandate on or about March 7, 2022.

57. Since that time Dr. Spiehs' speech has been restricted altogether from USD 497 property and this threat of arrest has chilled his speech and prohibited his right to associate altogether. Dr. Spiehs would like to personally and physically attend USD 497 school board meetings but has not done so because of violating trespass law.

58. On December 1, 2023, the plaintiff emailed defendant Lewis asking "I have attempted to reach you numerous times about my permanent ban and have received no response from you. Unless I hear from you otherwise, I assume I am still permanently banned."

59. On December 4, 2023, the plaintiff emailed the chief of police Lockhart and stated: "I have attempted to reach Superintendent Anthony Lewis multiple times about the

ban from school district property he placed on me in October 2021 but he has not responded (see below). I plan to attend the next school board meeting in person at the district administration building. Will I be arrested if I attend?

60. On December 6, 2023, the plaintiff forwarded to the defendant Lewis the email chain referred to above and stated "I'm following up on my email from the other day (see below) in order to know if I will be arrested or not for attending the school board meetings in person. Please let me know."

61. On December 6, 2023, defendant Lewis responded by email copying Rich Lockhart of the Lawrence police department, the clerk of the Board Alyse Donnell, and all of the Board members with the subject line "Permanent Ban" stating:

---

**From:** Anthony Lewis <Anthony.Lewis@usd497.org>
**Date:** December 6, 2023 at 3:11:06 PM CST
**To:** spiehsjustin@gmail.com
**Cc:** Alyse.Donnell@usd497.org, Rich Lockhart <rlockhart@lkpd.org>, Office Accountability <opa@lkpd.org>, Shannon Kimball <skimball@usd497.org>, GR Gordon-Ross <gr.gordon-ross@usd497.org>, Kelly Jones <kelly.jones@usd497.org>, ccaduebl@usd497.org, bbyers@usd497.org, Erica Hill <ehill@usd497.org>, psmith@usd497.org
**Subject: Re: Permanent ban**

Justin,

Thank you for your patience as I was out of the office last week and getting caught up on my emails.

You are correct; you are still not permitted to be on any USD 497 property as a result of the no trespass issued to you by LKPD on October 26, 2021, on behalf of USD 497.

You are still permitted to access our School Board meetings at the link provided here. In addition, you are still permitted to provide public comment by signing up in advance by emailing PublicComment@usd497.org by 6 p.m. on the day of a board meeting, then you may participate via Webex video/phone conferencing.

---

As a reminder, board meetings begin at 6:00 pm on the second and fourth Monday of the month. I have attached a schedule of the meetings for your convenience. Feel free to view the meeting agendas here.

Below are the Public Comment Procedures:

This is your time to share your opinions; however, public comment is not the appropriate forum for making complaints about specific staff or students. If your comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policy KN (Complaints) or Board Policy GAE (Personnel Complaints).

The board president or presiding officer of the meeting may direct that a public comment request be redirected to staff in order to comply with board policy and/or to protect the privacy of individual staff or students. For assistance in sharing a complaint or concern with district staff, please inform the board clerk or other district staff member.

Topics discussed in public comments shall be germane to the business of the Board of Education. The board president or presiding officer will invite commentary on topics not included on the meeting agenda at the beginning of each meeting. Comments relating to agenda items are welcome after the board has had the opportunity to discuss the topic. **Please limit your comments to three (3) minutes.**

Comments or actions that are threatening to staff, the board, or others in attendance, including the use of foul language or any other behavior that is disruptive of the board meeting, will not be permitted during public comment. Additionally, the district assumes no responsibility and/or liability for the information shared during public commentary. The views expressed are solely those of the speakers and do not necessarily reflect the views of the Lawrence Public Schools.

I hope this helps!

Thank you!



**Anthony S. Lewis, Ph.D.**
Superintendent
Educational Support Center
110 McDonald Drive
Lawrence, KS 66044
785/832-5000
www.usd497.org

62. None of the copied recipients of the email ever communicated any disagreements with the statements made by the defendant Lewis in his December 6, 2023, email.

63. Defendant Lewis is a policymaker for USD 497. Each of the defendants are aware of the ban directed towards Dr. Spiehs. The defendant Board had and has authority over the defendant Lewis to restrict or modify his policy decisions such as this ban directed to Dr. Spiehs.  Despite having that authority, none of the defendants have done so.

64. Each defendant Board has ratified or condoned defendant Lewis' ban and the Boards' speech code as applied to Dr. Spiehs. *See Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir.1991).  An inference of policy or custom may be drawn from a failure to take remedial action after a constitutional violation.

65. Defendants had a policy or custom of viewpoint discrimination from the failure of Board to take any remedial steps after the violation. *Larez; Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

66. Defendant Lewis violated plaintiff's first amendment rights to speak and assemble by permanently banning the plaintiff on October 26, 2021, from any USD 497 property because of a purported mask violation which was also retaliation for exercising plaintiff's First Amendment rights.

67. A few weeks prior to defendant Lewis' ban, the school board had pictures of themselves taken in the Lawrence High School but with no masks.  At a following open meeting, Dr. Spiehs confronted the Board with that hypocrisy. A few days later Superintendent Lewis issued his permanent ban against Dr. Spiehs.

68. Defendant Lewis has continued to retaliate against the Plaintiff through current date for this one time violation of a mask requirement that no longer exists.

69. Dr. Spiehs is well known in the Lawrence, Kansas community as a community activist boldly speaking about matters that government does not like to hear in ways that might be considered shocking, rudely truthful, earthy, or even crass. Dr. Spiehs protested the mask mandate daily outside the USD 497 administrative building. Defendant Lewis was aware of Dr. Spiehs' daily protests.

70. Debate on public issues does not always—or even often—boil down to whether one is for or against a particular proposal. And because of that, the "First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal v. Tam*, 582 U.S. 218, 249 (2017) (op. of Kennedy, J.). "It protects the right to create and present arguments for particular positions *in particular ways, as the speaker chooses.*" *Id.* (emphasis added).

71. Defendant Lewis targeted Dr. Spiehs because of his status and viewpoints and used his animosity and predispositions against Dr. Spiehs and his political viewpoints as a basis to retaliate and permanently ban, and continue to ban, Dr. Spiehs from USD 497 property.

72. Each day that defendant Lewis banned Dr. Spiehs from any physical presence on USD 497 property, church attendance, or attendance at USD 497 school board meetings that occur on USD 497 property constituted a prior restraint on speech which was further evidence of retaliation because banning Dr. Spiehs from all USD

497 buildings, at the time of the mask requirement, and after the mask requirement was lifted, was and is not reasonable or necessary.

73. Defendant Lewis does not have authority to permanently ban Dr. Spiehs from personally attending USD 497 school board meetings. There is nothing in the School Board's participation policy that provides any Board member, much less defendant Lewis, to prohibit anyone, including Dr. Spiehs, from attending an open meeting conducted by the School Board.

74. "Courts have consistently held that categorically banning individuals from open school board meetings is unreasonable and unconstitutional." *Mama Bears of Forsyth County v. McCall,* 642 F.Supp.3d 1338, 1362 (2022).

75. "A school official's determination that an individual poses a threat to school safety is, without more, insufficient to justify such a broad ban." *Worthley v. School Committee of Gloucester*, 652 F.Supp.3d 204, 215 (2023) (granting injunctive relief as to trespass notice prohibiting Mr. Worthley not to appear on or enter the premises of school during school hours or at any school sponsored event or activity till end of school year).

76. In *Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005), the plaintiff was prohibited under threat of trespass arrest from entering Vermont state court facilities. A "categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review." *Id.* at 549.

77. In *Cyr v. Addison Rutland Supervisory Union*, 60 F.Supp.3d 536 (D.Vt. 2014), Mr. Cyr was prohibited for two years under trespass threat of arrest in entering school

property.  Mr. Cyr was consequently banned from attending school board meetings. The *Cyr* court held that the ban was not narrowly tailored to address the specific threat Mr. Cyr allegedly posed to the school principal.  The *Cyr* court held that the trespass ban could have been limited to "school hours" or even posted a police officer at the public meetings allowing Mr. Cyr to attend.

78. One or all of the defendant Board members considered Dr. Spiehs the crazy protest guy. In September 2021 the school board called police and then had four 5 minute recesses waiting for the police to arrive.  This was prior to the public comment section which the Board anticipated, because of Dr. Spiehs presence, that he would also speak. When police arrived, the Board proceeded with the meeting.

79. Judge Story in *Mama Bears* further ruled that "singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else ... is unreasonable." (quoting *McBreairty v. Sch. Bd. of RSU 22*, 616 F.Supp.3d 79, 96 (D. Me. July 20, 2022)).

80. The government defendants cannot prohibit future expressive activity by Dr. Spiehs as a result of some purported past unlawful conduct such as a onetime occasion of not wearing a mask at a public function.  And to make matters worse there has been no mask requirement for individuals entering USD 497 property for almost two years. This is raw retaliatory censorship.  *See Polaris Amphitheater Concerts, Inc. v. City of Westerville,* 267 F.3d 503, 507 (6th Cir. 2001) ("where a law sets out primarily to arrest the future speech of a defendant as a result of his past conduct, it

operates like a censor, and as such violates First Amendment protections against prior restraint of speech").

81. Judge Story cited *Stevens v. Sch. City of Hobart*, 2015 WL 4870789, at *14 (N.D. Ind. Aug. 6, 2015). The *Stevens* plaintiff resigned from his job at a defendant School City of Hobart after he was accused of child molestation by a former student. After his resignation, he was informed that he should not enter school property and if so would be considered trespass. Yet Stevens expressed a desire to attend after-school hours School Board meetings and to attend school events. Id at *2-5. The *Stevens* court held in part that the ban "was not narrowly tailored to achieve the interest" of protecting students. Instead, it foreclosed "a means of communication" and that the complete ban achieved order during school hours.

82. In *Brown v. City of Jacksonville*, 2006 WL 385085 (M.D.Fla. 2006) that court granted a motion for a preliminary injunction regarding an individual who had been barred from attending City Council meetings for seven City Council cycles. Brown court noted that the plaintiff Brown "was effectively prohibited from attending or speaking at City Council meetings and City Council Committee meetings for almost three months." 2006 WL 385085, at *1. The ban was imposed because Mr. Brown had not observed the rules of the Council when making his remarks at a Council meeting.

83. The *Brown* court rejected the idea that Mr. Brown could still communicate through alternative means but that "such alternative channels do not amount to ample alternatives that would be comparable to the "same degree as her own passionate deliverance of her messages in person at the meetings."

84. If the prohibitions on future expressive activity of seven consecutive cycles of meetings (three months) in *Brown*, for two years as in *Cyr,* and a ban of an indefinite period in *Huminski* violate the First Amendment. then it follows inexorably that a two year and counting permanent ban directed to Dr. Spiehs which suppresses his future expressive activity must also be invalidated.

85. The banning of Dr. Spiehs is an unconstitutional censorship on free speech and assembly. Barring Dr. Spiehs from attending or addressing the School Board at open meetings during Public Comments is functionally a prior restraint, which is presumptively unconstitutional. *Neb. Press Assoc. v. Stuart*, 427 U.S. 539, 592 (1976).

86. Dr. Spiehs was banned from attending the opening meetings but then was given WEBEX link to provide public comments but only through WEBEX.

87. On February 6, 2022, Dr. Spiehs, and two other individuals were protesting at the corner of 110 McDonald Drive, where Lawrence school district headquarters are located. One of the signs included defendant Lewis' name, his salary and the letters 'WTF.'"

88. Defendant Lewis was driving a car at that location. Defendant Lewis appeared to direct his vehicle towards the protestors including Dr. Spiehs causing Dr. Spiehs concern that he may be struck by defendant Lewis' vehicle.

89. Sue Herynk, one of the protestors stated that defendant Lewis' car swerved toward the group when they were standing at the edge of the intersection and came within three or four feet of Dr. Spiehs.

90. Defendant Lewis admitted that his vehicle came out of lane and that the car had "jerked."

91. A police report was filed by Dr. Spiehs and an investigation was conducted about the incident. Defendant Lewis was aware of the police report, that Dr. Spiehs had filed it, a few days later and prior to February 14, 2022.

92. On February 14, 2022, the Board conducted an open meeting under Kansas law in which Dr. Spiehs was prohibited from associating with other individuals attending and to physically attend that open meeting. The Board permitted an internet WebEx connection for Dr. Spiehs and then allowed multiple speakers, both before and after Dr. Spiehs spoke, to mention both staff and students including praising superintendent Anthony Lewis. Comments were made by public speakers about specific students and their issues. Comments were made by a USD 497 teacher who played an audio recording of her students voices on her phone.

93. At that meeting the first public speaker was defendant Lewis' pastor. This pastor began by stating his intention to speak directly about and to defendant Lewis, which, according to the public comment restrictions, was not permitted. Nevertheless, the defendants understood the pastor's intentions but did not warn him and allowed him to talk about defendant Lewis intimating that the pastor believed defendant Lewis was divinely sent. The pastor was allowed to speak directly to defendant Lewis and about defendant Lewis by name without interruption, warning, or removal from the meeting.

94. At that meeting two speakers spoke about specific issues related to their respective children who were USD 497 students.  One speaker also spoke about their children's teachers by name saying positive things about the named teachers. Other speakers praised their child's teachers.

95. A USD 497 teacher spoke by beginning her public comments by stating her intention to play audio recordings of her students on her phone taken at school which violated the Board's restrictions on public comments.  The Board did not warn this teacher of violating the restriction and then permitted her to play the recording of those students without any adverse consequences including being interrupted or removed from the meeting.

96. When Dr. Spiehs spoke by WebEx and mentioned Anthony Lewis by name, along with his and one other Lawerence school administrator salaries, the Board stopped Dr. Spiehs from speaking.  He was instructed by the Board president that he could not discuss School staff.

97. Dr. Spiehs then attempted to mention an anonymous student who resisted wearing a mask – which he was again stopped by the board president.  Dr. Spiehs was told he could not speak about specific students even when no names are used.

98. The Board president then instructed the WebEx operator to remove Dr. Spiehs from the WebEx connection.

99. After this removal, a subsequent speaker spoke about his child who was a student in the USD 497 district – and specific issues about his child while praising USD 497 teachers. The defendants did not interrupt this speech or give any adverse

consequences to this public speaker even though he discussed a student and school staff.

100. There is no authority in USD 497 school board policy to remove speakers from a meeting over a purported speech code violation.  The board retaliated against Dr. Spiehs by stopping that speech and then removing him from the WebEx because of the viewpoint and content of his speech which the defendants did not like.

101.  On April 11, 2022, USD 497 conducted a meeting subject to the Kansas Open meetings law.

102. Dr. Spiehs continued to be banned from associating with those present at the meeting or to physically be present during the meeting.  Dr. Spiehs inquired of defendant Lewis the reasons he had applied for another position at a different school district.

103. Dr. Spiehs was interrupted by the Board president and was instructed he could not discuss individual USD 497 staff.

104. The First Amendment Free Speech Clause "protects the right to create and present arguments for particular positions *in particular ways, as the speaker chooses*." *Tam*, 582 U.S. at 249 (emphasis added). Put more simply: words matter. Criticizing school officials by name conveys a unique message that a vague reference to teachers or administrators or the school district does not capture.

105. That's perhaps why, it is often said, that people hate Congress but love their own representatives. *See* CHRIS CILLIZZA, PEOPLE HATE CONGRESS. BUT MOST INCUMBENTS GET RE-ELECTED. WHAT GIVES?, Washington Post (May 9, 2013), available at

https://perma.cc/CGN6-E256. Speech about individual government officials sends a different message than speech about an institution. And by censoring the use of names, directing all praise or criticism to the institutions rather than the people responsible, government officials blunt the message in a way that protects themselves.

106. Dr. Spiehs explained that the defendants had allowed defendant Lewis' pastor to discuss individual USD 497 staff in talking about defendant Lewis – albeit in a positive manner. Dr. Spiehs confronted the defendants with the hypocrisy and inconsistent treatment to him. The defendant Board president then instructed the WebEx operator to remove Dr. Spiehs from the WebEx connection which occurred.

107. There was no authority in any Board policy to remove Dr. Spiehs' connection.

108. This removal of Dr. Spiehs' connection was retaliatory because of Dr. Spiehs' speech which the defendants did not like.

109. On April 25, 2022, the Board conducted an open meeting subject to the Kansas Open Meetings law. Dr. Spiehs was banned by defendant Lewis from associating with those physically present or to physically attend that meeting.

110. Dr. Spiehs was provided a WebEx connection. Dr. Spiehs attempted to read a story about a character named "Lewis Anthony." Defendant Lewis gestured to the defendant Board President with his hand indicating that Dr. Spiehs should be silenced or disconnected. The Board president instructed the WebEx operator to terminate Dr. Spiehs' WebEx connection.

111. There was no authority in any Board policy to terminate Dr. Spiehs' WebEx connection. The defendants retaliated against Dr. Spiehs by terminating the connection because of the viewpoint of Dr. Spiehs' speech given in each WebEx connection.

112. On May 23, 2022, the defendants conducted an open meeting. Dr. Spiehs was prohibited by defendant Lewis from physically attending that open meeting. Dr. Spiehs was given a WebEx connection. Dr. Spiehs then read the entire same story he had prepared at the April 25, 2022, open meeting with the real or fictional names removed. Dr. Spiehs was not interrupted in giving this same speech.

113. Defendants banned Dr. Spiehs from participating or speaking at a later public speaking section by WEBEX each evening for 90 days which is unconstitutional. *See Mnyofu v. Bd. of Educ. of Rich High Sch. Dist. 227,* No. 15 C 8884, 2016 U.S. Dist. LEXIS 45773, at *2 (N.D. Ill. Apr. 5, 2016) (The Commission shut off the microphone in the midst of a citizen activist's speech).

114. On June 1, 2022, Dr. Spiehs received a letter from attorney Jeffrey L. Heiman stating that "due to multiple and repeated violations of USD 497's public commentary policy (BCBI) you will not be allowed to provide public comment via Webex for a period of ninety (90) days from the date of this letter."

115. The letter stated in full that the following:



WEBSTER L. GOLDEN
WINTON A. WINTER, JR.
SHERRI E. LOVELAND
MOLLY M. WOOD
CHRISTOPHER F. BURGER*
WESLEY F. SMITH
BRADLEY R. FINKELDEI
MATTHEW H. HOY*
LESLIE M. MILLER
EMILY A. DONALDSON, CELA*
REBECCA J. WEMPE
PATRICIA E. HAMILTON*
JOHN T. BULLOCK□

*ADMITTED IN KANSAS AND MISSOURI

□ADMITTED IN KANSAS, MISSOURI,
AND CALIFORNIA

□ADMITTED IN KANSAS AND VIRGINIA

*CERTIFIED ELDER LAW ATTORNEY

**STEVENS & BRAND LLP**

ATTORNEYS AT LAW

US BANK TOWER
900 MASSACHUSETTS, SUITE 500
POST OFFICE BOX 189
LAWRENCE, KANSAS 66044-0189
PHONE: (785) 843-0811  FAX: (785) 843-0341

June 1, 2022

JEFFREY L. HEIMAN
KANA R. ROLLER
SCOTT E. TADDIKEN, PA
DENISE L. McNABB
J. ERIC WESLANDER
AMY L. DURKIN
RICHARD S. SCHOENFELD
KATE MARPLES SIMPSON
WHITNEY L. CASEMENT
ANN J. PREMER
THOMAS D. HANEY, OF COUNSEL

PETER K. CURRAN, RETIRED

RICHARD B. STEVENS
1899-1991
JOHN W. BRAND
1907-1971
JOHN W. BRAND, JR
1932-2015
EVAN H. ICE
1963-2016

Dr. Justin Spiehs
spiehsjustin@gmail.com

    Re:  USD 497 Board Meetings

Dr. Spiehs:

    Due to the multiple and repeated violations of USD 497's public commentary policy (BCBI) you will not be allowed to provide public comment via Webex for a period of ninety (90) days from the date of this letter. However, you are permitted to provide written public comment for the Board for their consideration.  Please submit any written public comment you may have via email to PublicComment@usd497.org.

    USD 497 will allow you to present via Webex again starting September 1 in accordance with policy BCBI.

    Thank you in advance for your cooperation.

              Very Truly Yours
              STEVENS & BRAND, LLP

              Jeffrey L. Heiman

cc:  Dr. Anthony Lewis

116. When attorney Heiman was asked to cite the Board authority to ban an individual, he referred to https://www.usd497.org/domain/6884.

117. Mr. Heiman was asked "I looked at the link. I didn't see anything about being able to ban members of the public but I may be missing something.  Is there something specific you can point me to on that?"  Attorney Heiman responded on July 1, 2022, stating "You are correct that the Board's policies and rules do not contain a 'penalty' provision.  Nevertheless, the Board clearly has the authority to enforce its policies and rules as well as control its proceedings to ensure orderly and efficient meetings."

118. Attorney Heiman did not identify what or when the purported violations occurred.  Heiman did not provide Dr. Spiehs any notice of any purported violation and did not solicit his answer or explanation before the adverse consequences were meted out by the defendants.

119. There is no authority contained in the Board's BCBI policy to ban a speaker from participating in public comments for any period of time.  The Board retaliated against Dr. Spiehs because of his prior speech during the WebEx connections which the Board did not like.

120. Not only was there no authority to remove Dr. Spiehs from attending the Board's open meetings or in terminating each WebEx connection, if the issue to the defendants was Dr. Spiehs' speaking, if there was any authority to do so (which there was not) the Board had more narrowly tailored means to prevent Dr. Spiehs' speech by muting his WebEx connection while allowing him to listen.

121. Rather than avail itself of that mechanism, the defendants chose to retaliate and make Dr. Spiehs an example by terminating his WebEx connection as punishment for Dr. Spiehs' speech which the defendants did not like.

122. The ban prevented plaintiff Spiehs from the ability to have his grievances addressed at this forum.

123. The actions of the defendants were unreasonable, not narrowly tailored because prospectively banning a speaker without proof of dangerousness interferes with the speaker's right to interact with elected representatives. *See Reza v. Pearce,* 806 F.3d 497, 500-01 (9th Cir. 2015).  Under this policy, Dr. Spiehs was and continues to be subjected to open meeting bans for unidentified violations without any evidence of disruption or danger to anyone and without any Board authority to do so.  This objectively and unreasonably chills speech.  *See Walsh v. Enge,* 154 F. Supp. 3d 1113 (D. Or. 2015) (court enjoined enforcement banning speakers from city council chambers).

124. At an open meeting conducted by the Board on July 11, 2023, speaker Michael Eravi attempted to read that same story that Dr. Spiehs attempted to say at a prior Board open meeting.  The Board interrupted Mr. Eravi but did not have him removed or banned from attending any open meetings conducted by the defendant Board.

### SECOND CAUSE OF ACTION
### Violation of Plaintiff's Fourteenth Amendment Right to
### Equal Protection of the Law
### (42 U.S.C. § 1983)

125. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

126. If not wearing a mask at the October 26, 2021, public meeting merits a lifetime ban from USD 497 property for Dr. Spiehs why not for his friend who did the same thing? Dr. Spiehs' friend did not receive similar treatment meted out by defendant Lewis.

127. The First Amendment limits the government's authority to regulate private speech on public property. *Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997).

128. Plaintiff is a "class of one" and alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215-16 (10th Cir. 2011).

129. "A violation of equal protection occurs when the government treats someone differently than another who is similarly situated." *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, Kan., 927 F.2d 1111, 1118 (10th Cir. 1991).

130. The Board and USD 497 administrators often discuss USD 497 employees outside of such executive session. In fact, every USD 497 open meeting includes a period for recognitions during which it acknowledges and recognizes specific named USD 497 staff and students for accomplishments that they have achieved.

131. The superintendent and other administrators' monthly reports given at these open meetings often involve discussing specific staff members and their job performance.

132. Dr. Spiehs has named specific speakers in this Complaint who are comparators – similarly situated – to Dr. Spiehs. Each public speaker dresses in an individual

manner.  Each speaker waits his or her turn to approach the podium.  No speaker is required to be a resident – and the only requirement is that the speaker provide a name – whether true or an alias.

133. The policy created, interpreted, or enforced by defendant Lewis treats viewpoints about staff and students unequally and arbitrarily.  If the viewpoints are positive or otherwise complimentary they are permitted to be spoken at open meetings conducted by the School Board.  However, if the viewpoints are negative or otherwise not flattering, Board Policy KN purports to prohibit those comments at open meetings and then require that those negative viewpoints spoken by non-employees of the USD 497 school district must only be spoken to district staff as provided under Board Policy KN.

134. This purported personnel rule violates the First Amendment because "no conceivable governmental interest" justifies prohibiting individuals from discussing the very matters that USD 497 administrators speak about during the Board's public meetings.  See *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987).  Yet that is how defendant Erica Hill interprets the Board's public comment restrictions: Individuals listening to, for example, the superintendent's report about district policy are forbidden from negatively commenting about students or staff. This defies reason.

135. But the KN policy does not make this requirement and in fact recognizes that a "general complaint" can be "made directly to the board as a whole" which encompasses public comments at open meetings conducted by the School Board.

136. In fact the KN policy does not prohibit "general complaints" from being made to the Board at open meetings – rather it establishes a process for how the Board will resolve the complaint: "it will first be referred to the superintendent or the superintendent's designee for study and possible resolution."

137. Despite defendant Lewis' erroneous interpretation and application as applied to Dr. Spiehs, the KN policy does not provide defendant Lewis any authority to prohibit negative viewpoints concerning students and staff.

138. Public speakers at the Board open meetings were allowed to speak on the same topics – students and staff – without interruption or adverse consequences because the Board liked the viewpoints expressed by each speaker. One speaker began to speak the identical speech regarding staff and students that Dr. Spiehs attempted to give which did not result in the Board removing the speaker from the meeting.

139. However, when Dr. Spiehs attempted to speak on the same topics – students and staff – Dr. Spiehs was not only interrupted but removed from further participation in the WebEx connection. These speakers are similar to Dr. Spiehs in all material respects.

140. Dr. Spiehs is similarly situated to other public speakers who speak at a public comments open meeting before the Board.

141. Defendants have chosen to take no adverse action against speakers who support or endorse the viewpoints the defendants like such as complimentary statements about students and staff, but they take adverse action against a speaker like Dr.

Spiehs who has different viewpoints about the same topics and brings up viewpoints that are personally embarrassing or offensive to the defendants.

142. After taking the many adverse actions against Dr. Spiehs for purported speech code violations, the defendants have knowingly refrained from taking the same adverse actions against other speakers who have purportedly violated the speech code in the same manner or in discussing the same topics and viewpoints as the plaintiff Dr. Spiehs.

143. Defendants' customs, practices, and their enforcement have also been applied to discriminate intentionally against Dr. Spiehs' rights to freedom of speech, right to be free from compelled speech (if speaking, only making positive statements), right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

144. Defendants' Policy and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to School Board's asserted interests unprohibited.

145. Defendants applied their Policy and related practices to Dr. Spiehs in a discriminatory and unequal manner, granting other speakers the right to express their views on the same topics and subjects as Dr. Spiehs attempted to speak on while denying that right to Dr. Spiehs, in violation of Dr. Spiehs' right to equal protection of the law under the Fourteenth Amendment.

## THIRD CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Associate, Freedom of Speech and Religion
### (42 U.S.C. § 1983)

146. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

147. USD 497 is certainly entitled to keep its private property private. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 390–91 (1993). But the rules change when the government opens its property for others to speak. *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995). The defendants have not kept all of USD 497 property private at all times – it contractually rents to churches to conduct religious activities on Sundays.

148. USD 497 has contractually opened its school property to the purposes of those who rent school space on the property on Sundays, including churches. Once USD 497 has opened its school property forum "the State must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995). In addition to time, place, and manner restrictions, the government may enforce content-based restrictions on speech, but only insofar as those restrictions "preserve the purposes of that limited forum." *Id.* at 830.

149. Churches rent USD 497 school locations on Sunday and because of the defendants' ban directed at Dr. Spiehs, Dr. Spiehs is prohibited from associating with those parishioners, listening to messages, or in participating in those religious exercises.

150. Dr. Spiehs has a First Amendment right to access USD 497 public property which in many cases is a designated public forum. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012). Regulations on speech in public and designated public forums require more exacting scrutiny. *Cole v. Goossen*, 402 F. Supp. 3d 992, 1013 (D. Kan. 2019).

151. The public continues to be invited to USD 497 public events which are public forums. This Count implicates two distinct First Amendment interests: Dr. Spiehs right to engage in speech and his right to receive information through attendance at the USD 497 public events including church services in which the public is invited to attend.

152. There is no question that these two interests are protected under the First Amendment. *See Stanley v. Georgia*, 394 U.S. 557, (1969) ("Constitution protects the right to receive information and ideas"); *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) ("right to receive ideas follows ineluctably from the sender's First Amendment right to send them"); *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982). *L. H. v. Indep. Sch. Dist.*, No. 4:22-CV-00801-RK, 2023 WL 2192234 (W.D. Mo. Feb. 23, 2023).

153. Defendants' ban directed to Dr. Spiehs violates, much less does not preserve, the purpose of the church forums conducted on USD 497 property on Sundays.

154. Speech in a USD 497 school district public forum cannot be discriminated against based on viewpoint, and the restriction must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985).

155. Dr. Spiehs has a First Amendment right to exercise religion and attend church services and meetings conducted on USD 497 property which are at least public forums open to the public. Defendant Lewis' ban applied to Dr. Spiehs violates his rights to associate, exercise religion, and free speech.

156. Defendants actions have suppressed and altogether prohibited Dr. Spiehs "to petition the government for a redress of grievances." U.S. Const. amend. I.

157. The First Amendment right to petition the government for redress "extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Generally speaking, claims under the Petition Clause are "analyzed no different than" a claim under the Free Speech Clause. *Glover v. Mabrey*, 384 F. App'x 763, 776 (10th Cir. 2010).

158. Appearing before an elected school board to engage in a public discussion about school policy constitutes "petition[ing] the Government for a redress of grievances." U.S. Const. amend. I.

159. As applied to Dr. Spiehs, defendant Lewis' time, place, and manner restrictions directed to Dr. Spiehs regarding USD 497 property is unconstitutional, irrational, and unreasonable.

### FOURTH CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Content & Viewpoint Discrimination**
**(43 U.S.C. § 1983)**

160. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

161. The defendants have suppressed Dr. Spiehs's speech because of his prior and present viewpoints. The manner in which defendants apply whatever speaking policies defendants think apply does ban certain ideas—viewpoints about staff that defendant Erica Hill thought were embarrassing, did not like, or was criticism of school officials – but not complimentary speech about the same topics and individuals.

162. It makes no difference that the defendants allow other forms of criticism. *See Rosenberger,* 515 U.S. at 831.

163. The defendants have suppressed Dr. Spiehs's speech because of the viewpoints he has expressed or wants to express at open meetings conducted by the School Board.

164. The defendants have not drawn "a reasonable line" when regulating the content of speech at its open meetings. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

165. Government bears the burden of "articulat[ing] some sensible basis for distinguishing what may come in from what must stay out." *Id.* And its rules must further—rather than undermine—the purpose of the forum. *Id.* at 1891. Thus, the defendants inconsistent categorical bans on certain kinds of speech of Dr. Spiehs violate the First Amendment because defendants cannot explain "why such a restriction 'preserves the property' for the . . . uses to which it has been put." *Int'l*

*Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 692 (1992) (O'Connor, J., concurring).

166. The defendants' respective actions targeted certain viewpoints on a subject matter such as defendant Lewis, USD 497 students and staff. Defendants have targeted Dr. Spiehs' particular views on those topics for disparate and adverse treatment. Defendants restricted and punished Dr. Spiehs' views because they didn't like him and because of their respective specific motivating ideology, opinion, and perspective.

167. Defendants inconsistent and ostensible ban on Dr. Spiehs mentioning students or school personnel because it is perceived as negative or embarrassing (while allowing others to speak on the same topics if positive) fail the *Mansky* "forgiving test." *Mansky*, 138 S. Ct. at 1888.

168. Defendants purported application of its speech policies to Dr. Spiehs reaches far broader than whatever legitimate interest Defendants may have for enacting or applying its policies. And it imposes an "expansive" ban on an entire class of political speech that undermines the purpose of the open meetings forum conducted by the school board.

169. A ban on mentioning school personnel or students in a negative fashion is not reasonable in that forum which is dedicated to discussing school and education matters. Schools are run by people. Those people, including defendant Lewis, implement education policy daily—the same public policy that USD 497 is statutorily charged with adopting. Criticizing or complimenting these government officials who

run the schools and execute education policy fits within the scope of USD 497's BCBI public-comment policy.

170. As one court has explained, "[a]n opinion that a school employee is incompetent in performing school duties or violating the law governing the performance of the employee's duties is in fact relevant to the purpose of the limited public forum." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 426 (E.D. Pa. 2021). Thus, the manner in which defendants interpret its speaking policy "undermines" defendants' "interest in maintaining" a forum to hear opinions about school and education matters, *Mansky*, 138 S. Ct. at 1891, because it prevents speakers from discussing issues that otherwise fit within the "subject matter" that the school board seeks input on. *See Lamb's Chapel*, 508 U.S. at 393.

171. Making matters worse, the interpretation and application of the amorphous purported speech rules governing public comments at the Board's open meetings directed at Dr. Spiehs prohibits core First Amendment speech. "The right to criticize public officials is at the heart of the First Amendment's right of free speech." *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir. 1993). That is why the Constitution protects "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). So it "is a serious matter when the whole point of [defendants' application of its speaking policy] is to prohibit the expression of political views" about the officials responsible for enacting government policy. *See Mansky*, 138 S. Ct. at 1891.

172. Defendants restricted and punished Dr. Spiehs' views because of his specific motivating ideology, opinion, and perspective. The defendants view Dr. Spiehs as an unwelcome antagonist due to his protest status and outspokenness about social issues such as mask and vaccine mandates.

173. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs' speech was suppressed.

174. Defendant Lewis acted with a viewpoint discriminatory purpose when he banned – and continues to ban – Dr. Spiehs from USD 497 property.

175. Defendant Lewis purports to justify his permanent ban based upon a one-time incident regarding a mask requirement – a requirement no longer in existence. Defendant Lewis' reasoning or explanations justifying his permanent ban are a sham and pretextual as to his real motivation in banning Dr. Spiehs' because of Dr. Spiehs' speech about masking requirements and that in actuality, this was a motivating factor for defendant Lewis suppressing Dr. Spiehs' speech and in retaliating against Dr. Spiehs.

176. Nor can defendants "articulate some sensible basis" for banning all mention of school personnel or students by Dr. Spiehs no matter the context. *Mansky* at 1888.

177. Hypothetically, the board may offer up a handful of justifications – preventing harassment and defamation of employees, protecting their confidential information, and maintaining orderly meetings. But defendant Lewis' salary is not confidential. Defendant Lewis' job searches were published in news stories. Student are habitually identified at board meetings albeit in positive ways. The same is true for staff.

178. "Laudable as these explanations and rationale are," it's not hard to "envision scenarios in which members of the public may have legitimate reasons" to criticize school officials "personally or directly." *See Mama Bears of Forsyth Cnty. v. McCall*, at *23.

179. And there are ample ways to prevent the narrow problems that the Board might worry about. See id. ("For example, the prohibitions on 'physically threatening remarks' and disruptive conduct could be invoked to limit certain speech directed towards Board members that may have, for lack of a better phrase, crossed the line, and terminate speech or conduct that inhibits the meeting's progress").

180. The government can prohibit actual, actionable harassment of school officials, and it can protect confidential information about employees from disclosure. But a blanket ban on mentioning school officials or students no matter the reason or context is so far removed from these problems that they cannot justify excluding a large swath of speech that is directly relevant to the purpose of the forum.

181. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs was banned and is continuing to be banned from USD 497 property.

182. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs was banned and is continuing to be banned from associating with other citizens at open meetings conducted by the School Board.

183. Each defendant acted with a viewpoint-discriminatory purpose when Dr. Spiehs was banned and is continuing to be banned from attending and speaking at open meetings conducted by the School Board.

184. The manner in which defendants restrict Dr. Spiehs' speech violates the First Amendment interest in preventing the government from creating artificial debate on issues of public importance.

185. The Free Speech Clause prevents the government from wielding its power to "manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys. v. FCC,* 512 U.S. 622, 642 (1994). This "constitutional safeguard, [the Supreme Court] has said, was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times,* 376 U.S. at 269. It is "the theory of our Constitution" that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). And if the First Amendment does anything, it prevents the government from interfering in public debate to "effectively drive certain ideas or viewpoints from the marketplace" of ideas. *Turner Broad.*, 512 U.S. 641.

186. Defendants are manipulating public debate in its application of the public comment rules as applied to Dr. Spiehs. "The Supreme Court has long…warned about the pernicious effects of an artificially controlled public debate and [has] held that the First Amendment serves to prevent such manipulation." *Bach v. Sch. Bd. of Va. Beach,* 139 F. Supp. 2d 738, 742 (E.D. Va. 2001).

187. That danger exists because the defendants regulate the content of Dr. Spiehs' speech, and it is no less worrisome that the government manipulates debate on its own property. *See Rosenberger*, 515 U.S. at 831–32 (adopting a broad interpretation

of viewpoint discrimination to prevent a university from "skewing" public debate in a limited public forum).

188. The defendant school board, of course, can choose not to open a public comment forum at all in its open meetings. But it cannot open a forum that skews "the marketplace of ideas." *See id.* at 831. That's because "the first amendment is concerned, not only with the extent to which a law reduces the total quantity of communication, but also -- and perhaps even more fundamentally -- with the extent to which the law distorts public debate." GEOFFREY R. STONE, CONTENT REGULATION AND THE FIRST AMENDMENT, 25 WM. & MARY L. REV. 189, 198 (1983).

189. This Court should prevent the defendants from manipulating debate where defendants purport to set up an ostensibly free and fair discussion that turns out to be neither. The First Amendment cabins the government's power over speech even in a limited public forum – and why defendants speech rules directed at Dr. Spiehs is unconstitutional. Content-based restrictions must be viewpoint-neutral – when this school board allows for input on school personnel and students, that is the topic. Defendants cannot be permitted to prevent Dr. Spiehs from sharing his own unique message about that topic. And content-based restrictions must be reasonable – because the Board opens a forum for discussion about staff and students, it cannot undermine that discussion by excluding otherwise relevant speech.

**FIFTH CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Declaratory and Injunctive Relief**
**As Applied Challenge**

190.  Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

191. The School Board's forum was opened to no subject-matter limitations as long as the topics expressed positive messages. This undermines any legitimacy to the School Board's interest in curtailing speech about the same topic (staff and students) in the Public Comment section of the Board's open meetings.

192. The School Board's speaking policy has been applied to the plaintiff Dr. Spiehs in a discriminatory and disparate fashion. As pointed out previously in this Complaint, numerous other speakers are permitted to speak on the topics of students or staff.  That topic was allowed without interruption, suppression of the speech, or removal from the building or a WebEx connection but only if the speaker expressed a positive message.  The defendant president of the school perceived Dr. Spiehs' speech as not meeting that criteria and consequently prohibited his speech. as a result of the speakers respective speeches.

193. To prevail, Dr. Spiehs "'must show that [he was] prevented from speaking while someone espousing another viewpoint was permitted to do so.'" *Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023). Even if this Court finds that the public comment restrictions are constitutional as applied to speakers who mention public officials while discussing school policy, the uncontroverted evidence establishes that these Board president enforced the policy against Dr. Spiehs when he talked in ways

46

that defendant Lewis did not appreciate while allowing—and even encouraging—other speakers to express positive views.

194. A Board president censored Dr. Spiehs, in part, to stop him from pointing out defendant Lewis job searches and salary as well as the superintendent's public statements about policy.

195. The defendant Board President enforced restrictions against Dr. Spiehs when she perceived him as being critical but allowed others to speak favorably.

196. Each Board President "prevented [Dr. Spiehs] from speaking while someone espousing another viewpoint was permitted to do so." *Harmon*, 61 F.4th at 789.

197. The permanent ban from school property is arbitrary and unreasonable as applied to Dr. Spiehs because it is one thing to ban a person from school property while students are present – another to ban from a church or school board meeting because the church or school board chooses to meet on school property.  Under that reasoning, any public board (municipal or county) could exclude Dr. Spiehs from participating in all meetings held at any time or date by virtue of choosing a USD 497 school property.

**SUPERINTENDENT LEWIS AND THE BOARD PRESIDENT ACTIONS ARE UNAUTHORIZED**

198. To constitute policy of the Board, including public comments, the Board has set out its own requirements for that which does not provide for Superintendent Lewis unilaterally creating additional restrictions or guidelines for individuals speaking during the Board's open meetings.  There is nothing in any Board Policy that gives

the Superintendent authority to ban individuals from attending the Board's open meetings or to otherwise place restrictions to that right.

199. Under the Lawrence School Board Policy Manual, Section B - School Board Operations, Policy Review and Adoption, Code BDA, it defines policy and provides for the adoption and review of all Lawrence Board policies:

---

BDA - Policy Review and Adoption
The board will regularly review its policies and will, as needed, amend and supplement existing policies. Board policies may be amended at any regular or adjourned meeting of the board by a majority vote of the members of the board.

Policy Draft Writer
The superintendent, in cooperation with the board policy committee, shall draft all recommended policy changes, including new policy recommendations.

Staff Involvement (See GAA)
In formulating policy recommendations to be made to the board, the superintendent may involve staff members.
Community and Student Involvement
The board may involve patrons and students in the development of board policy. In formulating policy recommendations to be made to the board, the superintendent is encouraged to involve community members and students as appropriate.
A proposal by any individual or group of citizens or patrons to adopt or amend any policy or rule may be submitted at any regular board meeting. Such proposals will be referred to the board policy committee.

Policy Adoption
The board shall adopt new policies and delete or modify existing policies. All handbooks are to be approved by the board and adopted, by reference, as a part of these policies and rules. Policies must be adopted, amended, or repealed through the following sequence of actions:
    1. The board, superintendent, or superintendent's designee submits request to adopt new policy/policies or to delete or modify existing policies to the board policy committee
    2. Board policy committee shall meet to review the request, draft appropriate language and recommendation to the board
    3. The committee shall evaluate the proposal for adoption as new policy or as an amendment to existing policy and report its recommendation to the board at a regular meeting

---

> 4. Board may act on committee recommendation at the next regular board meeting
>
> 5. Adoption of new or modified policy may be included as part of the consent agenda
>
> 6. When the board deems it appropriate, adoption of new or modified policy may be included as part of the agenda of a special meeting
>
> <u>Policy Dissemination</u>
> Changes in board policy shall be disseminated in the manner provided by the rules and regulations of the board. The superintendent shall be responsible for developing a procedure to ensure that board policies are available on the district website and that all changes, additions, and deletions are reflected in a timely manner on the website. Patrons who do not have web access may either request copies of a policy from a school secretary or request the use of an attendance center computer, when available, to access board policy online. A copy of board policy shall also be kept in the district office.
>
> The clerk of the board shall keep an historical set of board policies which shall reflect all revisions, amendments, or other actions pertaining to every policy and rule.

200. Under the Lawrence School Board Policy Manual, Section B - School Board Operations, Code BCAE, It states:

> BCAE - Public Hearings
> The board of education may hold public hearings on matters which the board deems appropriate. The board will normally hold public hearings before acting to change attendance center boundaries or holding a bond election.
> Kansas statute requires a hearing when closing school buildings.
> Public hearings will be held at a convenient time and a suitable place. The board may hold more than one (1) hearing at different times and places.
> The board will determine who shall preside at such hearings and will request every participant to state his name, residence, and purpose for speaking. The procedure governing public participation at board meetings is found in Board Policy BCBI.

201. The BCAE specifically states that the "procedure governing public participation at board meetings is found in Board Policy BCBI."

202.    Under Lawrence School Board Policy Manual Policy  B, School Board Operations, Public Participation, Code BCBI, it references the Kansas Open Meetings Act (KOMA), KSA 75-4317. It states:

BCBI - Public Participation

The general public will be invited to attend all board meetings, except executive sessions. At each meeting of the board, the president or the presiding officer of the board shall welcome all visitors to the board meeting.

At each regular board meeting, the agenda may include a time for public comment. During that time, the board president or presiding officer may invite to speak those patrons who have requested in advance to participate in the public comment period. The rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself. The board president or presiding officer may impose a limit on the time a visitor may have to address the board and the total time devoted to public comment at any given meeting. The board president may ask groups with the same special interest to appoint a spokesperson to deliver the group's message. Except to ask clarifying questions, board members shall not interact with speakers during public comment.

Board work sessions and board-appointed committees meet for a specific purpose or for the completion of a previously scheduled agenda. These are open meetings at which the public is welcome. Time for public comment at these meetings is at the discretion of the chairperson or at the direction of the board.

Written public comment may be submitted to the board at any time.

203. In USD 497's website it contains additional conditions for public comment:

This is the public's time to share opinions, but the board asks that patrons please avoid making comments of a personal nature about any district employee or student, including the use of personal names. The board also requests that patrons remain civil when speaking and/or listening.
***
This is your time to share your opinions. However, public comment is not the appropriate forum for making complaints about specific staff or students. If needed, the board president or presiding officer of the meeting may direct that a patron's comments be heard by the board in executive session in order to protect the privacy of the individuals to be discussed.

> Before participating in public comment to share a complaint, the board requests
> that public commenters follow the complaint procedures set out in board and
> district policy, as appropriate. If you need assistance in these processes, please let
> the board clerk or other district staff know.

204. In defendant Lewis' email he added another condition: "public comment is not the appropriate forum for making complaints about specific staff or students. If your comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policy KN (Complaints) or Board Policy GAE (Personnel Complaints)."

205. The Board has never voted on approving all of the speaking requirements contained in defendant Lewis December 6, 2023, email to Dr. Spiehs or in the USD 497's website containing public comment requirements. Many of the requirements emailed to Dr. Spiehs by defendant Lewis or published on the USD 497 website are inconsistent or conflict with the Operational Procedure of USD 497.

206. None of those speaking conditions in the website or defendant Lewis' email have been created utilizing the procedures the Board imposed upon itself for the creation of a bona fide public comment policy. Instead, they appear to be the ad hoc unilateral creations of defendant Lewis which are void and unenforceable.

207. BCBI refers to "rules for public comment" but does not provide notice to the public as to what those rules are. Rather than identify or provide notice of the rules in its published policy manual, the Board purports to create rules for public comment pursuant to an inapplicable policy governing long-range goals for guiding the operations of the district. It states that:

> The Lawrence Public Schools Board of Education adopts these governance and operating procedures to enhance and facilitate a positive board culture, which in turn will enhance and facilitate a positive teaching and learning environment throughout the district

208.    Under the Lawrence School Board Policy Manual Policy  A, School District

Organization, District Goals and Objectives, Code ABE it states:

> The board will establish and annually review a set of long-range goals and objectives to guide the operations of the district.  The board may also adopt objectives for one (1) or more years.  All personnel in the district shall direct their efforts toward achieving the goals and objectives of the district to provide effective learning environments in which students achieve academic and life skills to reach their maximum potential.
> The board will participate in long-range planning through an annual meeting with the superintendent and designated staff to review progress on the implementation of priorities, initiatives, and long-range plans.  The board also will consider and act upon objectives and major activities proposed by the superintendent to achieve long-range goals.
>
> The superintendent shall develop necessary procedures, forms, or other measures to implement this policy.
>
> The superintendent shall provide opportunities for interested patrons to become knowledgeable about the long-range planning process of the district, and to review and to make recommendations concerning specific district long-range plans.
>
> The superintendent shall give the board periodic progress reports.

209. The Board then publishes a document titled "Board of Education Governance &

Operating Procedures."  The purpose, according to Policy ABE, is "to establish and

annually review a set of long-range goals and objectives to guide the operations of the

district." Defining Rules of public comment is not the subject matter of Policy ABE,

which authorizes the subject matter.

210. "It is self-evident that an indeterminate prohibition carries with it the

opportunity for abuse, especially where it has received a virtually open-ended

interpretation." *Mansky*, 138 S. Ct. at 1891. While "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," [the Board president's] "difficulties with its restriction go beyond close calls on borderline or fanciful cases." "And that is a serious matter when the whole point of the exercise is to prohibit the expression of political views." *Id.*

211. The form that the defendants used in from April 11, 2022, through July 11, 2022, was this:



## USD 497 Board of Education
### Public Comment Form

**INSTRUCTIONS:**

**Please read the information below.** Complete the form and give it to the communications director. The board president will collect the forms. This information will assist in keeping an official record of individuals who comment during meetings. It will also assist the board and staff members in responding to questions and issues that arise during audience participation. Thank you!

**PROCEDURES:**

The board president will invite comment on topics <u>not</u> included on the agenda at the beginning of each meeting. Comments relating to agenda items are welcomed after the board has had the opportunity to discuss the topic. **Please limit comments to 3 minutes.**

**NAME:**
_____

**ADDRESS:___**
_____

**EMAIL:_____**                **PHONE:____**
_____

**GROUP/SCHOOL AFFILIATION:_____**
_____

**TOPIC YOU WISH TO DISCUSS:___**
_____

### PUBLIC COMMENTARY (Pursuant to Board Policy BCBI)

The USD 497 Board of Education welcomes public comments and thanks you for taking time to talk to us about our policies and procedures. We set aside this time during our regular meetings to hear from the public.

**This is your time to share your opinions.  However, complaints about specific staff or students will be heard by the board in executive session in order to protect the privacy of the individuals to be discussed.**

While you are not required to share your contact information, we ask for that information so district staff or the board can follow up with any specific concerns you may have.

Please limit your comments to 3 minutes. Thank you.

212. In USD 497's website it contains additional conditions for public comment:

> This is the public's time to share opinions, but the board asks that patrons please avoid making comments of a personal nature about any district employee or student, including the use of personal names. The board also requests that patrons remain civil when speaking and/or listening.
> ***
> This is your time to share your opinions. However, public comment is not the appropriate forum for making complaints about specific staff or students. If needed, the board president or presiding officer of the meeting may direct that a patron's comments be heard by the board in executive session in order to protect the privacy of the individuals to be discussed.
>
> Before participating in public comment to share a complaint, the board requests that public commenters follow the complaint procedures set out in board and district policy, as appropriate. If you need assistance in these processes, please let the board clerk or other district staff know.

213. In defendant Lewis' email he added another condition: "public comment is not the appropriate forum for making complaints about specific staff or students. If your comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policy KN (Complaints) or Board Policy GAE (Personnel Complaints)."

214. Defendant Erica Hill  interprets the reference to "privacy" as justifying the limitation and termination of Dr. Spiehs' speech.  Yet the website does not refer to avoiding privacy as a command – rather it "asks" which is a suggestion.  Yet the defendants interpret the privacy issue as a command.

215. The website also refers to "a complaint" (which is unlimited as to persons or topics) and then makes a request ("requests" that individuals follow a "complaint procedure").  Defendants apply these requirements to Dr. Spiehs which are void, inconsistent, and vague.

216. The defendant board president applied the "complaints about specific staff or students" to mean that Dr. Spiehs could not speak negatively about named staff or students. They similarly applied it to permit positive statements about named staff and students. President Hill applied the reference to "privacy" as prohibiting Dr. Spiehs from discussing at all USD 497 staff or students at all including the salary of defendant Lewis.

217. The Board vests total discretion in the Board President to decide whether comments violate a restriction. "That discretion must be guided by objective, workable standards." *Mansky* at 1891. If USD 497's school board "wishes" to limit the context in which speakers can discuss staff or students during public comment, "it must employ a more discernable approach than the one [it] has offered here." *Id*.

218. The Board president's actions exceed its authority provided in the Board's policies.

219. The defendant board president applied the BCBI policy then effective and the public comment form then effective to give the board president authority to stop Dr. Spiehs' speech and to terminate his WebEx connection.

220. In an open meeting conducted by the Board, Dr. Spiehs asked the board specific questions about their mask policy and they did not respond to his questions. Yet the next speaker asks the Board clarifying question in support of the vaccine clinics and the Board members responded.  Dr. Spiehs questioned from the audience why the Board responded to the next speaker but not his.

221. Under the way President Hill has applied the restrictions to Dr. Spiehs, he can voice the opinion that a school is underperforming because the curriculum is wrong, because teachers are underpaid, or because the class sizes are too large. But Dr. Spiehs is forbidden from voicing the opinion that a school is underperforming because the school officials—the superintendent Lewis, or the principal, or the teachers – responsible for executing school policy are failing.

222. As applied to Dr. Spiehs, criticizing school curriculum is allowed but a comment criticizing personnel for choosing that curriculum is not. That is quintessential viewpoint discrimination. It "targets 'particular views taken by speakers on a subject.'" *Summum*, 130 F.3d at 917 (quoting *Rosenberger*, 515 U.S. at 829–30).

223. Nor does it matter that the any restriction prohibits positive and negative comments alike. That conclusion "reflects an insupportable assumption that all debate is bipolar," contravening the Supreme Court's "understanding of the complex and multifaceted nature of public discourse." *Rosenberger*, 515 U.S. at 831. Debate on public issues does not always boil down to whether one is for or against a particular proposal. And because of that, the "First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal*, 582 U.S. at 249 (op. of Kennedy, J.). This "broad construction" of viewpoint discrimination dooms the boards' public comment restrictions as applied to Dr. Spiehs. *Summum*, 130 F.3d at 917.

224. There is no authority in the BCBI policy or the public comment form for the board president to stop Dr. Spiehs' speech on the occasions described in this complaint or to terminate his WebEx connection.

225. There is no authority in the BCBI policy or the public comment form that purports to give defendant Lewis the authority to permanently ban Dr. Spiehs from USD 497 property, church meetings, or school board meetings that are open to the public.

### SIXTH CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Declaratory and Injunctive Relief
### Facial Challenge

226. Under 42 U.S.C. §§ 1983 and 1988, Dr. Spiehs is entitled to appropriate relief invalidating Defendants' challenged policy and related conduct.

227. A law or regulation is void-for-vagueness when "people of ordinary intelligence" do not have "a reasonable opportunity to understand what conduct it prohibits." *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1201 (10th Cir. 2005).

228. "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972).

229. The defendant Board delegated to each board president the scope of authority at these open meetings conducted by the Board.  This formal authority continues under current policy and constitutes an ongoing standard operating procedure of the Board.

230. Defendant Erica Hill had final policy making authority regarding the suppression of Dr. Spiehs' speech and his repeated termination of the WebEx

connections during a Kansas Open Meeting. Their respective acts itself constituted an act of official government policy of the Board.

231. Each Board member who had final policy-making authority ratified each Board president's unconstitutional actions.

232. A First Amendment violation centers on three questions: (1) whether speech is protected, (2) the type of forum, and (3) the justification for restricting speech. *See Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997). Dr. Spiehs' speech on each occasion cited in this Complaint was protected speech.

233. At the injunction and trial level, the burden is upon defendants to justify their actions. *See Greater Phila. Chamber of Commerce v. City of Phila.,* 949 F.3d 116, 133 (3d Cir. 2020) (In "First Amendment cases the initial burden is flipped"); *See Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 660 (2004) (same). The government bears the burden of proving the law is constitutional, tracking the burdens at trial. *Id.*

234. Each defendant bears the burden to show each and every reason each defendant suppressed Dr. Spiehs' speech and his subsequent removal was Constitutional. *See Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2426 (2022) ("Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District").

235. Defendants cannot sustain their burden that each of their actions was Constitutional.

236. The School Board's speaking policy is unconstitutionally vague for these reasons: first, it does not provide people of ordinary intelligence with reasonable opportunity to know what is prohibited; and second, it authorizes arbitrary or discriminatory enforcement. The current BCBI policy with its reference to other speaking requirements is unconstitutionally vague.

237. First, speakers under the speaker's form it states the board president "will invite comment on topics not included on the meeting agenda." The inclusion of "topics not included on the meeting agenda" indicates what? – that speaking on this non-agenda topics now becomes the business of the board? Or does it mean that the speaker is not limited to talking about topics "germane to the business of the board"?

238. The form also appears to contemplate future restrictions but not a present authority to limit a speaker from speaking. It refers to "continued or egregious violations" which is vague. Does it mean a repeat violation of the same restriction or does it mean any prior violations and for what time span? How does one know what an "egregious violation" is? This subjects the speaker to arbitrary enforcement by the board president.

239. The form refers to "foul language" which is vague.

240. The defendants' public comment restrictions refer to "should be germane to the business of the board" which inclusion of the word "should" makes it unclear whether this is a suggestion or a command. "Should" means that germane was only advisory: if the word "shall" had been used it would make germane mandatory.

241. And taken as a whole, the phrase "should be germane to the business of the Governing body" is unconstitutionally vague. Defendants cannot sustain their burden to show that the suppression of plaintiff's speech or his removal under the Speaking policy was Constitutional.

242. The restrictions are unworkable, unreasonable, and overbroad and vague.

243. The restrictions are not viewpoint neutral when taken as a whole considering all of the activities of the Commission.

244. The defendants' policy and related practices are not narrowly tailored as applied to Dr. Spiehs because Dr. Spiehs' expression does not implicate any of the legitimate interests any defendant might have.

245. Unless the policy and conduct of the defendants are enjoined, Dr. Spiehs will continue to suffer irreparable injury to his First Amendment rights to petition government and to engage in protected speech.

246. In 2023, the Operational Procedure document then delineates and adds language to the prior Procedure language:

> ### PUBLIC COMMENT
> #### (Pursuant to Board Policy BCBI)
> The USD 497 Board of Education welcomes public comments and thanks you for taking time to talk to us about our policies and procedures. We set aside this time during our regular meetings to hear from the public.
>
> Patrons who wish to participate in public comment must fill out the public comment registration form so that district staff or the board can follow up with you regarding your public comment as necessary.
>
> This is your time to share your opinions. However, public comment is not the appropriate forum for making complaints about specific staff or students. ~~If needed, the board president or presiding officer of the meeting may direct that a patron's comments be heard by the board in executive session in order to protect the privacy~~

~~of the individuals to be discussed~~. <u>If your comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policies KN and GAE (General Complaints and Personnel Complaints). The board president or presiding officer of the meeting may direct that a public comment request be redirected to staff in order to comply with board policy and/or to protect the privacy of individual staff or students. If you need assistance in sharing a complaint or concern with district staff, please let the board clerk or other district staff know.</u>

~~Before participating in public comment to share a complaint, the board requests that public commenters follow the complaint procedures set out in board and district policy, as appropriate. If you need assistance in these processes, please let the board clerk or other district staff know~~.

<u>Topics discussed in public comments shall be germane to the business of the board.</u> The board president <u>or presiding officer</u> will invite comment on topics not included on the <u>meeting</u> agenda at the beginning of each meeting. Comments relating to agenda items are welcomed after the board has had the opportunity to discuss the topic. **Please limit your comments to 3 minutes**.

<u>Comments or actions that are threatening to staff, the board, or others in attendance, including the use of foul language or any other behavior that is disruptive of the board meeting, will not be permitted during public comment. Additionally, t</u>~~T~~he district assumes no responsibility and/or liability for the information shared during public commentary. The views expressed are solely those of the speakers and do not necessarily reflect the views of the Lawrence Public Schools.

247.    The revised form provided to public speakers states the following:



USD 497 Board of Education
**PUBLIC COMMENT REGISTRATION FORM**

Date: _____

Name: _____

Residence Address: _____

E-mail: _____    Phone: _____

Topic/Subject to be addressed:

_____

_____

_____

### Guidelines for Public Comments
(Please read, sign, then deliver to board clerk.)

To provide for a positive experience beneficial to the Board of Education and members of the public, the following guidelines apply to participation in the limited public forum:

- Please proceed to the podium after requested by the board president or presiding officer to address the board.

- When beginning your comments to the board, please share your name, the city where you live, and, if relevant, your position within the district or which school(s) your student(s) attend or have attended in the district. If you are speaking on behalf of a group or organization, please also identify the name of the group you are representing and the group's connection with the school district.

- Please limit your comments to three (3) minutes.

- If you want the board to consider any written materials, please provide nine copies of such materials or email the materials to the board clerk or PublicComment@usd497.org.

- Topics discussed in public comments should be germane to the business of the board.

- Statements or actions that are threatening to staff, the board, or others in attendance, including use of foul language or any other behavior that is disruptive of the board meeting, will not be permitted during public comment.

- Continued or egregious violation(s) of these guidelines may result in the temporary or indefinite limitation of a speaker's privilege to address the board.

**I have read and understand the above information and will abide by these procedures.**

Signed: _____

**Lawrence Public Schools USD 497**
110 McDonald Drive | Lawrence, KS 66044-1063
Phone: 785-832-5000 | Fax: 785-596-6546 | www.usd497.org

248. In USD 497's website it contains additional conditions for public comment:

> This is the public's time to share opinions, but the board asks that patrons please avoid making comments of a personal nature about any district employee or student, including the use of personal names. The board also requests that patrons remain civil when speaking and/or listening.
> ***
> This is your time to share your opinions. However, public comment is not the appropriate forum for making complaints about specific staff or students. If needed, the board president or presiding officer of the meeting may direct that a patron's comments be heard by the board in executive session in order to protect the privacy of the individuals to be discussed.
>
> Before participating in public comment to share a complaint, the board requests that public commenters follow the complaint procedures set out in board and district policy, as appropriate. If you need assistance in these processes, please let the board clerk or other district staff know.

249. In defendant Lewis' email he added another condition: "public comment is not the appropriate forum for making complaints about specific staff or students. If your comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policy KN (Complaints) or Board Policy GAE (Personnel Complaints)."

250. Defendant Erica Hill interpreted the reference to "privacy" as justifying the limitation and termination of Dr. Spiehs' speech.  Yet the website does not refer to avoiding privacy as a command – rather it "asks" which is a suggestion.  Yet the defendants interpret the privacy issue as a command.

251. The website also refers to "a complaint" (which is unlimited as to persons or topics) and then makes a request ("requests" that individuals follow a "complaint procedure").

252. Other Board policies regarding "complaints" and how they must be made are vague and viewpoint discriminatory.

253. The defendant Board president have arbitrarily interpreted the BCBI Policy to suppress and punish the content and viewpoint of Dr. Spiehs' speech.

254. There is a credible or objectively justified fear of future enforcement of these policies because there has been a past enforcement of the same Board requirements for the same conduct of Dr. Spiehs.

255. The application of these requirements are purposely designed to permit the unguided and arbitrary enforcement according to the particular interpretations of any given Board president. The cited words and phrases are unconstitutionally vague because they lack "objective, workable standards" that a person of ordinary intelligence can understand. *Marshall*, 571 F. Supp. 3d at 424 (quoting *Mansky*, 138 S. Ct. at 1891). The terms are "irreparably clothed in subjectivity." Id. This subjectivity renders the rule unconstitutionally vague. *Id*.

PRAYERS FOR RELIEF

256. As to all counts, Defendants, under color of law, have deprived and continue to deprive the plaintiff of the right to free speech and freedom of religion in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, this plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the defendants' unconstitutional

customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

257. To obtain a permanent injunction, Dr. Spiehs "must prove (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *United States v. Uintah Valley Shoshone Tribe*, 946 F.3d 1216, 1222 (10th Cir. 2020). On the first factor, Dr. Spiehs succeeds on the merits for the reasons discussed above. He suffers irreparable harm absent an injunction because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020). Finally, the last two factors merge when the opposing party is the government, *Denver Homeless out Loud v. Denver,* 32 F.4th 1259, 1278 (10th Cir. 2022), and injunctions "protecting the core First Amendment right of political expression" serves the public interest, *Homans v. City of Albuquerque,* 264 F.3d 1240, 1244 (10th Cir. 2001). Thus, all four factors favor Dr. Spiehs.

258. Dr. Spiehs' right to be free of a permanent ban from entering school property, from attendance at church meetings on school property on Sunday, and from attendance at open school board meetings occurring on school property, was and is, at the time of the events in question, so clearly established by then-existing precedent that it was and is beyond debate.

66

259. Spiehs' right to be free of having his WebEx connection to a school board's open meeting terminated because of a purported speech code violation was and is, at the time of the events in question, so clearly established by then-existing precedent that it was and is beyond debate.

260. Dr. Spiehs' right to be free of a permanent ban based on a one-time occasion of not wearing a mask at a public meeting on school property on October 26, 2021, was and is, at the time of the events in question, so clearly established by then-existing precedent that it was and is beyond debate.

261. Dr. Spiehs' right to be free of a permanent ban based on defendant Superintendent Anthony Lewis' retaliation directed to Dr. Spiehs regarding his reputation in the Lawrence, Kansas community or Dr. Spiehs' one-time occasion of not wearing a mask on October 26, 2021, was and is, at the time of the events in question, so clearly established by then-existing precedent that it was and is beyond debate.

262. That the Lawrence School Board is bound to and restricted by its own policies was and is, at the time of the events in question, so clearly established by then-existing precedent that it was and is beyond debate.

263. Dr. Spiehs' First Amendment rights were callously violated by each defendant sued in their individual capacity.

264. Dr. Spiehs First Amendment rights were maliciously violated by each defendant sued in their individual capacity.

265. Dr. Spiehs First Amendment rights were wantonly violated by each defendant sued in their individual capacity.

266. Dr. Spiehs First Amendment rights were oppressively violated by each defendant sued in their individual capacity.

267. The acts by the defendants in this Complaint were prompted or accompanied by ill will, or spite, or grudge, either toward Dr. Spiehs individually, or toward persons in one of more groups or categories of which Dr. Spiehs is a member.

268. The acts by the defendants in this Complaint were done in reckless or callous disregard, or indifference to, the rights of one of more persons, including Dr. Spiehs.

269. The acts by the defendants in this Complaint were done in a way or manner which injures, or damages, or otherwise violates the rights of Dr. Spiehs with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of Dr. Spiehs.

WHEREFORE, the plaintiff requests that judgment be entered in his favor and against each defendant as follows:

A. An order enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from ejecting or otherwise removing plaintiff Spiehs or any public speaker solely because a claim by a Board president that the speech was off-topic;

B. An order enjoining defendants from enforcing the School Board's policy of complaints, privacy, and "should be germane to the business" because they are

advisory and not mandatory and is subject to unbridled discretion by a presiding board president in its interpretation and unconstitutionally vague;

C.  An order enjoining defendants from banning Dr. Spiehs from entering upon USD 497 property for any of the reasons of or claimed by defendant Lewis;

D.  Declaratory relief consistent with the injunction, to the effect that the Operating Procedure which contains additional speaker restrictions is unauthorized and unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech, religion, and to petition, and the Fourteenth Amendment's guarantee of due process against vague laws;

E.  An award of actual damages to the plaintiff;

F.  An award of nominal damages to the plaintiff.

G.  Against each individual defendant in their individual capacity an award of punitive and exemplary damages to the plaintiff;

H.  Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other relief as the Court deems just and appropriate.

DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:           913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

Verification of Amended Complaint

I, Dr. Justin Spiehs, am the plaintiff in the above-captioned matter.  I have reviewed the foregoing allegations in this Verified Amended Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Date: 5/30/2024

By: Dr. Justin Spiehs