IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Justin Spiehs<br>Plaintiff<br>v.<br>Anthony Lewis, in his individual capacity et al<br>Defendants | Case No.   5:23-cv-04121-TC-GEB<br><br>PLAINTIFFS' OPPOSITION TO USD 497 MOTION TO DISMISS (ECF 51) |

**CLAIMS REGARDING DAILY DENIALS OF FIRST AMENDMENT RIGHTS ARE TIMELY UNDER THE REPEATED VIOLATIONS DOCTRINE**

The defendant USD 497 narrowly construes "injury" for purposes of a 1983 statute of limitations analysis. It ignores the repeated violations doctrine. The Court should follow the reasoning of *Herrera v. City of Espanola*, 32 F.4th 980 (10th Cir. 2022). Defendant is correct that Dr. Lewis exercised discretion (arbitrary as it was) to ban Dr. Spiehs from all USD 497 property for each day of every month. Tomorrow will bring a new injury to Dr. Spiehs if this defendant continues to ratify and approve those actions. Defendant Lewis can reverse himself, as King Darius in the Biblical story of Daniel was not able to do so in reversing his own edict).[1] King Darius had no choice but to order Daniel thrown into the lions' den. Old Testament Book of Daniel, Chapter 6:16. But defendant Lewis and his school board can change their minds. Defendant USD 497 can release, at any time, Dr. Spiehs from his confinement den of not-welcome-here but to date refuses to do anything about it other than defend it.

---

[1] https://en.wikipedia.org/wiki/Darius_the_Mede ("His jealous rivals plot his downfall, tricking Darius into issuing a decree that no prayers should be addressed to any god or man but to Darius himself, on pain of death. Daniel continues to pray to the God of Israel, and Darius, although deeply distressed, must condemn him to be thrown into the lions' den because the edicts of the Medes and Persians cannot be altered").

Thus, Dr. Lewis' decree of daily banishment from the USD 497 empire was not akin to a criminal sentence issued in which the sentencing judge loses jurisdiction upon sentencing. Rather, this prohibition was – and is – interlocutory – it can be changed at the whim of Dr. Lewis. Nothing prevents Dr. Lewis from changing his mind, modifying, or making additional conditions under the unlimited arbitrary discretion Dr. Lewis purports to possess.[2]

Similarly, the *Herrera* court examined a similar discretion exercised – the City of Espanola, New Mexico, decided that a prior owner's delinquency on a water bill meant the city stop water delivery to its new owners February 2017. *Herrera* at 985. The City made a policy decision then – that "until someone paid Ms. Miera's water and sewer bill" it would never provide water service to the new owner Herrera. *Id.* Despite being contacted by the owners over a three year period, the City refused to change its policy: "The City consistently told Appellants that it would not recommence water service until someone paid Ms. Miera's bill." *Id*. Herrera filed his 1983 suit in June 2020. The City argued, and the lower court agreed, that all of Herrera's claims accrued no later than March 2017. *Id.* at 986. The *Herrera* court reversed claims against the City: "Appellants' § 1983 claims against the City premised on the City's alleged policy of conditioning water service to new property owners on the payment of bills owed by prior property owners is not time-barred under the repeated violation doctrine and our decision in *Hamer v. City of Trinidad*,

---

[2] In that sense King Darius would likely be pretty envious of defendant Lewis' unlimited discretionary power to make or revoke his own decrees.

924 F.3d 1093 (10th Cir. 2019)." *Id.* at 986. Both the City of Espanola and Dr. Lewis instituted their respective policies on a date certain. But in both cases there were daily new injuries because of those respective policies.

The *Herrera* court ultimately referred "repeated violations" and "continuing violations" as separate doctrines. *Id.* at 1001. The *Herrera* court held the repeated violations doctrine triggered a new limitations period for each day water service was denied. "And each day the City failed to provide water service to Appellants constituted a separate violation that triggered a new limitations period." *Id.* at 1001.

Dr. Spiehs filed suit on December 22, 2023. Applying a two year limitation period, Dr. Spiehs can claim repeated violations going back to 12/22/2021. Similarly, each day that Dr. Spiehs was denied his First Amendment rights to freedom of religion, freedom to associate, and freedom of speech, constitute "a new limitations period."³ Just as Mr. Herrera asked the City to change its mind, so did Dr. Spiehs – and Dr. Spiehs' request was within the two year statute of limitations. Dr. Lewis, in exercising his unlimited discretion, on December 6, 2023, not only refused to lift the ban but added limitations about the scope of public comments. ECF 50, ¶60.

## CAUSATION / MOVING FORCE

The question is whether there is a *Monell* link to the Board of Education for USD 497. Whether USD 497's acts were "a moving force" and played a part" in the

---

³ The "repeated violations doctrine divides what might otherwise represent a single, time-barred cause of action into several separate claims, at least one of which accrues within the limitations period prior to suit." *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 863 (10th Cir. 2023) (cleaned up).

3

violations was pled. *See King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (question is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"); *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008) (municipal liability is established where "policy, when enforced, causes a constitutional deprivation").

Even if the policymaker or USD 497 abused or exceeded its powers, for § 1983 liability all that is required is "state action," including abused power. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A municipality is a school board and a public school district. *Unified Sch. Dist. No. 480 v. Epperson*, 583 F.2d 1118, 1123 (10th Cir. 1978) (local Kansas school district "and its school board members acting in their official capacity, are not the alter ego of the state, but are more like a municipality, for example, and hence do not enjoy Eleventh Amendment immunity"); *M.T. v. Olathe Public School USD 233*, No. 17-2710-JAR-GEB, 2018 WL 1847036 (D. Kan. Apr. 18, 2018). Dr. Spiehs has pled municipal liability under a § 1983 alleging "(1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) the policy or custom was the moving force behind the constitutional deprivation." *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 800 (10th Cir. 2019). A municipality can be liable where there is a underlying constitutional violation by government. *Donahue v. Wihongi*, 948 F.3d 1177, 1199–1200 (10th Cir. 2020).

Final Policymakers are alleged with connections to Dr. Spiehs' multiple injuries. The Amended Complaint shows injury: (1) a daily ban from all USD 497 property; (2) a daily ban from attending church services on Sunday at USD 497 leased-to churches; (3) a daily ongoing ban from attending USD 497 open meetings; (4) a banishment to internet virtual viewing and participation in board meetings; (5) vague speech restrictions; (6) viewpoint based speech restrictions; (7) retaliation arising from his protected speech; and (8) equal protection violations. The arguments have been made in the previous opposition motions as well as the motion for injunctive relief citing case law which is incorporated herein.

### DELIBERATE INDIFFERENCE AND RATIFICATION

A "municipality may be held liable … through an omission … that manifests deliberate indifference to the rights of citizens." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). The bans have all been ongoing, renewed, or otherwise ratified for over two years. "Municipal liability may attach if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). The Clerk and Superintendent are employees of USD 497 and therefore USD 497 would have the ability to remedy. Dr. Spiehs has identified a policymaker, board member, and the USD 497 school district itself who has ratified the speech and ban decisions. *See C.F.B. v. Hayden*, No. 16-2645-CM, 2019 WL 1299679, at *12–13 (D. Kan. Mar. 21, 2019) (explaining "the final policymaker's approval of a subordinate's decision is the equivalent of the final policymaker making that decision," which, "if that decision …

was made deliberately from among various alternatives," could "be considered a municipal policy that gives rise to *Monell* liability"); *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.,* 786 F. App'x 774, 787 (10th Cir. 2019).[4] The Amended Complaint states USD 497 affirmatively approved Superintendent Lewis' first ban and the subsequent WebEx ban which in the end was the moving force of the multiple constitutional violations regarding petitioning government, free speech, and freedom of religion. "Liability will be imposed on a government entity for the actions of an official who is subject to review by other policymakers or who is limited by the policy and decisions of others only if the final policymaker ratifies the decision of the subordinate." *Meyer v. Nava*, 518 F. Supp. 2d 1279, 1287 (D. Kan. 2007). The ban is years long. And even in this Complaint having pointed out the deficiencies in the speech policies they remain unchanged and vigorously defended. A "lengthy and unjustified delay" in implementing remedial measures can establish "deliberate indifference." *Hayut v. State University of New York*, 352 F.3d 733, 751 (2d. Cir.2003). *See also Davis v. Monroe Cnty. Bd. Of Educ.,* 526 U.S. 629, 649 (1999)(five month delay in responding to complaints could show "deliberate indifference").

---

[4] And Dr. Spiehs has made plausible claims even though the source and reasoning behind the bans has yet to be discovered. *See Arnold v. City of Olathe, Kan.*, 413 F. Supp. 3d 1087, 1110 (D. Kan. 2019)(noting plaintiff "had not yet been granted discovery into the policies, practices, and customs that may have resulted in the officers' actions" and holding at "this point in the litigation" plaintiff had alleged a plausible Monell claim against the city). *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (at summary judgment school administrator determined not a final policymaker, so the school could be held liable for her actions only if the final policymaker (school board) had "delegated authority to [the administrator] to make decisions on these matters, subject to the Board's final review and approval).

**POLICY AND CUSTOM**

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978) states that execution of an action that "may fairly be said to represent official policy, inflicts the injury" § 1983 holds the government "as an entity [ ] responsible…." *Monell* at 694. If the "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Id.* at 690. A municipality can be liable "pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision making channels." *Id.* at 690–91.

**WHAT IS THE OFFICIAL SPEECH POLICY OR CUSTOM AND WHO IS THE POLICYMAKER FOR EACH?**

The question of customs, policies, and policymakers are at issue in this case. State law is relevant but does not determine the factual nuances in this case. In some ways it represents a whack-a-mole analysis at this stage because of so many unstated unknowns. A municipal policy or custom may take many forms: a formal regulation or policy; a widespread, permanent, and well-settled custom; a decision by an employee with final policymaking authority; a final policymaker's ratification of both an employee's unconstitutional actions and the basis for them; or the deliberately indifferent failure to appropriately hire, train, supervise, or discipline employees. *Randle v. City of Aurora,* 69 F.3d 441, 446 (10th Cir. 1995); *Jackson v. City and County of Denver*, 2022 WL 120986, *3 (10th Cir.2022). There are three factors the Court considers: (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision are final – *i.e.,* are

they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority).

At this stage in the proceedings the Court possesses the Amended Complaint.[5] The "legal chain of authority" for the speech restrictions is not clear and certainly inferences exist. *Randle* at 448. USD 497 purports to have a public comment policy in its BCBI published policy – but it contains no speech limitations. That policy then refers to "rules" that are held by the Clerk of the Board. The USD 497 website publishes public comment rules but the source of those rules is unknown. And on top of all of that one should consider defendant Superintendent Lewis' speech rules in his email to Dr. Spiehs. Given the consortium integration of these rules with unclear sources then comes the next question: who is the policymaker for each of those sets of customs or policies? "Not all theories of municipal liability under § 1983 require (or depend on) a single final policymaker." *Hoefling at* 1279. And to the questions courts should not grant motions to dismiss for failing to plead the specific identity of a policymaker. *See Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S.Ct. 346 (2014); *Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016) (identity of the policymaker is a legal question and courts should not grant motions to dismiss for failing to plead

---

[5] Resolution of the Lewis, Donnell, or the Board's authority would require the Court to take judicial notice of extrinsic official documents and make factual determinations based on such materials. Such an inquiry would be inappropriate at the pleading stage of this action in the context of a Rule 12(b)(6) motion. *See Kearney v. Dimanna*, 195 F. App'x 717, 721 n.2 (10th Cir. 2006) (stating that it is "well-established" that a district court is "limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint" in deciding a motion to dismiss).

[a] specific identity). A "plaintiff is not required to single out the specific policymaker in his complaint." *Id.* at 282. Thus, to survive a motion to dismiss, Dr. Spiehs need only plead facts which establish that the challenged policy was promulgated or ratified by *a* policymaker.

Starting first with the published BCBI policy, the school board would be the policymaker. But the BCBI policy is actually silent on speaking restrictions. It points to "rules" kept by the Clerk or published on the website. So now the Clerk, the school board, or both could be the policymakers. As to defendant Superintendent Lewis, he too can be a policymaker. And his additional email speech restrictions could be considered his – or that of the school board – or both.

At this juncture in the proceedings, conducting a final policymaker analysis is for the most part factual. The relationship between defendant Lewis and the School Board defendants is factual. "A single act of an employee may be imposed on a local governmental entity if the employee possesses final authority to establish policy with respect to the challenged action." *Ireland v. Jefferson Cnty. Sheriff's Dep't,* 193 F.Supp.2d 1201, 1226 (D.Colo.2002). Banning individuals from USD 497 property or meetings could rest with the school board or its Superintendent – or both. The chain of authority was alleged that the Superintendent was employed by the Board and answered to the Board. "Lawfully empowered decisionmakers cannot insulate themselves from liability under section 1983 by knowingly allowing a subordinate to exercise final policymaking authority vested by law in the decisionmakers." *Ware* at 818. The allegations indicate that defendant Lewis' "decision is couched as a policy

9

statement expressly approved by the policymaking entity, or when the decision manifests a custom or usage of which the entity must have been aware." *Id.*

### WHAT IS THE OFFICIAL BANISHMENT POLICY OR CUSTOM AND WHO IS THE POLICYMAKER FOR EACH?

Identifying the perpetual ban as to Dr. Spiehs as a policy or custom doesn't seem that difficult. But what was the basis? Superintendent Lewis never says. So Dr. Spiehs must guess: he received a lifetime ban over a mask that was not worn at one meeting? And notice that while defendants proffered some policies there was no similar proffer as to why exactly Dr. Spiehs was – and continues to be – banned. That would be a state of mind evidentiary analysis. And a jury can certainly disbelieve anything and everything articulated now as *post hac* reasons. Getting banned to a virtual connection called WebEx is another custom or policy. Was that the Board or the Superintendent – or both the policymaker(s) for that? And the 90 day ban from the WebEx connection – the attorney doesn't say what specifically Dr. Spiehs did at any meeting or why those purported violations merited a 90 day ban from the open meetings. The attorney conceded there was no written authority for that action. And identifying any guidelines or guardrails to guide that power is yet unseen. Nothing in defendant Lewis' communications ever identify any actual reason or reasons for his permanent ban. One assumes it was over a one-time mask violation. Similar to the speech restrictions, did USD 497 have the ability to delegate to its Superintendent a vast unsupervised authority to permanently ban individuals from all USD 497 property? Or did USD 497 have that final policymaking authority yet allowed this "subordinate to exercise final policymaking authority"?

**THE BOARD AND USD 497**

The Amended Complaint alleges each board member's awareness and ability to dispute, overrule, or modify the permanent ban from USD 497 property or the 90 day ban. A jury could find the Board and USD 497 subject to municipal liability. *See Gilmore v Beveridge*, 2:22 -cv-02032 (D.Kan. June 21, 2023) (summary judgment order).[6]

**WHAT LIMITS DEFENDANT USD 497'S ARBITRARY AUTHORITY TO BAN?**

Defendant USD 497 brings nothing before the Court in which it claims it is authorized to ban anyone from USD 497 property and for any reason. Defendant invokes extraneous documents he says are "Board policies." Nothing in Exs. 1-4 refers to masks or any purported banning authority. The exhibits do not even facially refer to USD 497. The exhibits appear to refer to open meetings or making administrative complaints. Remarkably, the USD 497 does not point to any language in those documents that give anyone the authority to permanently ban any person from USD 497 property. "Even if the public participation policy did purport to give [USD 497] the authority to enact a permanent ban, it would not likely be constitutional." *Mama Bears* at 1362.

---

[6] Citing *Ritchie v. Coldwater Cmty. Sch.*, 947 F. Supp. 2d 791, 810-11 (W.D. Mich. 2013) (denying summary judgment because school board president's actions could constitute school board policy); *Besler v. Bd of Educ.*, 993 A.2d 805, 816-18 (N.J. 2010) ("Even if the remaining members of the Board had the authority to overrule [the president] and insist that [the plaintiff] be heard, they obviously acquiesced in the decision to silence [the plaintiff]" and "[i]n that sense, the members of the Board, by their silence, ratified [the president's] gaveling down of [the plaintiff]").

11

"It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse, especially where it has received a virtually open-ended interpretation." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018). To "pass constitutional muster," something must exist to "contain adequate standards to guide the official's decision." *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 372 (4th Cir. 2012). Put another way, whatever exists (which so far is unidentified) regarding the Superintendent's authority it cannot give him unbridled discretion. *See Summum v. Callaghan*, at 919; *Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation,* 322 F.3d 1298, 1310-11 (11th Cir. 2003); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572-73 (7th Cir. 2001); *Lewis v. Wilson,* 253 F.3d 1077, 1079 (8th Cir. 2001).

Defendant bears the burden to demonstrate his actions are Constitutional. See *Mama Bears of Forsyth County at* 1362 (citing *Matal v. Tam*, 582 U.S. 218, 137 S. Ct. 1744, 1763 (2017)). "However, in First Amendment cases the initial burden is flipped." *Id.* "Instead, the government bears the burden of proving that the law is constitutional and, as a result, the plaintiff must be deemed likely to prevail if the government fails to show the constitutionality of the law." *Id. See New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2130, 213 L.Ed.2d 387 (2022) (government "bears the burden of proving the constitutionality of its actions" when it restricts speech). Defendant bears the burden to show his actions permanently banning Dr. Spiehs from USD 497 property because of not wearing a mask two years ago are Constitutional. *See Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2426 (2022).

## RELIGION

Defendant makes a passing reference to religion claiming the permanent ban from USD 497 is "hypothetical." Defendant's ban is not hypothetical and prohibits Dr. Spiehs from daily exercising religion, as others are allowed to do, on USD 497 property leased to churches;

> 149 Churches rent USD 497 school locations on Sunday and because of the defendants' ban directed at Dr. Spiehs, Dr. Spiehs is prohibited from associating with those parishioners, listening to messages, or in participating in those religious exercises.

## WEBEX

Mere speech got Dr. Spiehs silenced – then removed – from each of the WebEx connections. Apparently offensive speech is equated with disruptive behavior. "Government cannot regulate speech by relabeling it as conduct." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020) (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). "Speech cannot be … punished or banned, simply because it might offend a [crowd]." *Forsyth County. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992). The "absence of express standards renders it difficult to differentiate between a legitimate denial of access and an illegitimate abuse of censorial power." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006). Defendant's *post hac* claims of disruption or other reasons as justification for his permanent ban. Indeed, among "the dangers posed by unbridled discretion" is the censor's "ability to hide unconstitutional viewpoint discrimination." *Id.*

13

The Amended Complaint sets out viewpoint discrimination, retaliation, and equal protection violations based upon defendant Lewis actions from which a jury could make that determination:

> 87 On February 6, 2022, Dr. Spiehs, and two other individuals were protesting at the corner of 110 McDonald Drive, where Lawrence school district headquarters are located. One of the signs included defendant Lewis name, his salary and the letters 'WTF.'"
> 88. Defendant Lewis was driving a car at that location. Defendant Lewis appeared to direct his vehicle towards the protestors including Dr. Spiehs causing Dr. Spiehs concern that he may be struck by defendant Lewis vehicle.
> 89. Sue Herynk, one of the protestors stated that defendant Lewis car swerved toward the group when they were standing at the edge of the intersection and came within three or four feet of Dr. Spiehs.
> ***
> 110 Dr. Spiehs was provided a WebEx connection. Dr. Spiehs attempted to read a story about a character named "Lewis Anthony." Defendant Lewis gestured to the defendant Board President with his hand indicating that Dr. Spiehs should be silenced or disconnected. The Board president instructed the WebEx operator to terminate Dr. Spiehs' WebEx connection.

Mentioning school staff or pseudo-names is not a basis to censure Dr. Spiehs:

> 130 The Board and USD 497 administrators often discuss USD 497 employees outside of such executive session. In fact, every USD 497 open meeting includes a period for recognitions during which it acknowledges and recognizes specific named USD 497 staff and students for accomplishments that they have achieved.
> 131. The superintendent and other administrators' monthly reports given at these open meetings often involve discussing specific staff members and their job performance.

## Conclusion

The plaintiff Dr. Spiehs has stated Equal Protection, First Amendment Association, retaliation, and Free Speech claims personally against defendant USD 497. The Court should deny the defendant USD 497's motion to dismiss.

14

15

<u>/s/Linus L. Baker</u>  
Linus L. Baker, KS 18197  
6732 West 185th Terrace  
Stilwell, KS  66085-8922  
Telephone:  913.486.3913  
Fax:             913.232.8734  
E-Mail: linusbaker@prodigy.net  
Attorney for the plaintiff

Certificate of Service
The above was provided notice to all parties entitled to such notice pursuant to the Court's electronic filing system.

<u>/s/Linus L. Baker</u>  
Attorney for the plaintiff

15