In the United States District Court
for the District of Kansas

———————

Case No. 23-cv-04121-TC-GEB

———————

JUSTIN SPIEHS,

*Plaintiff*

v.

ANTHONY LEWIS, ET AL.,

*Defendants*

———————

**MEMORANDUM AND ORDER**

Justin Spiehs sued a series of defendants associated with the Law-rence, Kansas School Board. Doc. 1; Doc. 50. He says they violated his rights under the First and Fourteenth Amendments, Doc. 50, and unsuccessfully sought a preliminary injunction against those viola-tions. Doc. 4; Doc. 46. Defendants move to dismiss Spiehs's claims. Doc. 21; Doc. 26; Doc. 28; Doc. 51. For the following reasons, three of their motions—Docs. 21, 26, and 28—are granted and one—Doc. 51—is granted in part and denied in part.

**I**

**A**

There are multiple pending motions. Each has its particular standard.

**1.** Defendants have filed several motions to dismiss. A federal district court may grant a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss for failure to state a claim, the complaint need only contain "a short and plain statement … showing that the pleader is entitled to relief" from each named defendant. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two

"working principles" underlie this standard. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, a court ignores legal conclusions, labels, and any formulaic recitation of the elements. *Penn Gaming*, 656 F.3d at 1214. Second, a court accepts as true all remaining allegations and logical inferences and asks whether the claimant has alleged facts that make his or her claim plausible. *Id.*

A claim need not be probable to be considered plausible. *Iqbal*, 556 U.S. at 678. But the facts, viewed in the light most favorable to the claimant, must move the claim from conceivable to plausible. *Id.* at 678–80. The "mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). In other words, the nature and complexity of the claim(s) define what plaintiffs must plead. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

Ordinarily, a motion to dismiss is decided on the pleadings alone. But "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (citation and internal quotation marks omitted). A court may also consider documents necessary to resolve disputed jurisdictional facts when a party challenges the factual basis for subject matter jurisdiction. *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 507–09 (10th Cir. 2023).

**2.** And Spiehs previously filed a motion for injunctive relief.[1] A preliminary injunction is an extraordinary remedy, with "the limited purpose…to preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation and quotation marks omitted). Under Rule 65 of the Federal Rules of Civil Procedure, the party seeking a preliminary injunction must show four things: that "they are substantially likely to succeed on the merits of their claims," "they will suffer irreparable harm if the injunction is denied," "their threatened injury without the injunction outweighs any harm to the party opposing the injunction," and "the injunction, if issued, is not adverse to the public interest." *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018)).

A preliminary injunction is never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Thus even a standard preliminary injunction—one that simply preserves the position of the parties pending trial—is extraordinary. *Id.*

## B

Spiehs lives in Johnson County, Kansas. Doc. 50 at ¶ 4.[2] He is nonetheless well known in Lawrence, Kansas "as a community activist boldly speaking about matters that government does not like to hear in ways that might be considered shocking, rudely truthful, earthy, or even crass." *Id.* at ¶ 69. Spiehs and a friend attended a "public presentation … at Lawrence High School" on October 26, 2021. *Id.* at ¶ 43. Lawrence High School is part of Unified School District 497 and the District's superintendent is Anthony Lewis. *Id.* at ¶ 5.

When Spiehs attended the presentation, the District had a masking policy. Doc. 50 at ¶ 42. Spiehs did not wear a mask. *Id.* at ¶ 43. So

---

[1] A motion hearing occurred on March 29, 2024. Doc. 46. That motion was denied on the record. Counsel for Spiehs indicated he did not plan to appeal the denial and did not request a written decision. As a result, the parties were advised that a written decision would be forthcoming in light of additional pleadings the parties anticipated filing. Doc. 46.

[2] All document citations are to the document and page number assigned in the CM/ECF system.

Lewis "instructed Lawrence police to remove Dr. Spiehs" and his friend from the school. *Id.* at ¶ 44. Lewis later "instructed Lawrence Kansas police that Dr. Spiehs was being given a lifetime permanent ban not only from Lawrence High School but from all [District] property…." *Id.* at ¶ 45. Lawrence Police issued Spiehs a no-trespass order on the District's behalf. *Id.* at ¶ 61. It remains in effect. *Id.*

The no-trespass order "categorically prohibit[s] Dr. Spiehs from personally attending any school board meetings." Doc. 50 at ¶ 52. That is, it forbids him from attending in person but allows him to "provide public comments … through WEBEX," *id.* at ¶ 86, a videoconferencing service, *id.* at ¶ 61.

The WebEx alternative was short-lived. Spiehs used WebEx to attend a Lawrence School Board meeting on February 14, 2022. Doc. 50 at ¶ 92. During the meeting, Spiehs presented comments "mention[ing] Anthony Lewis by name, along with his and one other Lawrence school administrator salaries." *Id.* at ¶ 96. The Board interrupted and instructed Spiehs that "he could not discuss School staff." *Id.* Spiehs continued, attempting "to mention an anonymous student who resisted wearing a mask." *Id.* He was "again stopped by the board president," who "then instructed the WebEx operator to remove Dr. Spiehs from the WebEx connection." *Id.*

Spiehs encountered similar issues at a second meeting. Doc. 50 at ¶¶ 101–103, 106. At a third meeting, he "attempted to read a story about a character named 'Lewis Anthony.'" *Id.* at ¶ 110. Anthony Lewis "gestured to the defendant Board President with his hand indicating that Dr. Spiehs should be silenced or disconnected," and he was disconnected. *Id.* Spiehs attended a fourth meeting, where he read a version of the "Lewis Anthony" story that omitted real and fictional names. *Id.* at ¶ 112. He was not interrupted this time. *Id.* Several weeks later, though, an attorney sent Spiehs a letter informing him that he would not be able to provide public comment via WebEx for 90 days. *Id.* at ¶ 114.

The WebEx ban was based on the Board's public commentary policy, which the parties refer to as the "BCBI policy," and the Board's "authority to enforce its policies and rules as well as control its proceedings to ensure orderly and efficient meetings." Doc. 50 at ¶¶ 114, 117. The BCBI policy was last amended in June 2022. Doc. 27 at 6; Doc. 27-2. It governs public "communications" with the Board. Doc. 27 at 3, ¶ 4. The public may "attend all board meetings,

except executive sessions." Doc. 50 at ¶ 202. And they can communicate with the Board, since the Board "may" provide for public comment at regular meetings. *Id.* Such comments are subject to rules that "shall be available from the clerk of the board prior to the board meeting and at the meeting itself." *Id.* These rules advise, among other things, that "public comment is not the appropriate forum for making complaints about specific staff or students." *Id.* Instead, complaints may "be heard by the [B]oard in executive session." *Id.* Similar admonitions appear elsewhere. *Id.* at ¶¶ 211–12 (public comment form, District website).

The Board also had another policy, titled "KN General Complaint." *See* Docs. 27-3 & 31-4; Doc. 50 at ¶ 213 (referencing this policy). The KN Policy governs "complaints" by members of the public to the board of education. Doc. 27 at 3, ¶ 4. Prior to 2023, it required that "complaints concerning students or staff" be addressed privately with district staff. Doc. 50 at ¶ 204. That policy was subsequently amended in 2023 and became far more robust; it now includes a distinction between general versus formal complaints, much more detailed procedures relative to how investigations, particularly those centered on formal complaints, are to be handled, as well as more specific guidance about certain types of complaints, such as those revolving around discrimination on the basis of sex, curriculum, and school rules, to name a few. *See generally* Doc. 31-4 at 1–4.

Finally, the Board provides suggestions based on its policies. *E.g.*, Doc. 50 at ¶ 61. In an email, it explained that "public comment is not the appropriate forum for making complaints about specific staff or students." *Id.* Instead, "[i]f … comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policy KN (Complaints) or Board Policy GAE (Personnel Complaints)." *Id.* Similar suggestions appear on the Board's website. *Id.* at ¶ 203.

## C

**1.** Spiehs sued Lewis, ten current and former members of the Board, and the Board's clerk on December 22, 2023. Doc. 1 at ¶¶ 5–16. He then amended his Complaint, Doc. 50, to substitute one member of the Board (who had been sued in his official capacity) for the Board itself. Spiehs's Amended Complaint contains six overlapping causes of action, all asserting constitutional violations by way of 42 U.S.C § 1983.

The first cause of action alleges that Defendants retaliated against Spiehs for his speech, violating the First Amendment. Doc. 50 at ¶¶ 66–68, 71–72, 79, 100, 107, 111, 119, 121 (titling the "first cause of action" as "Violation of Plaintiff's First Amendment Right to Freedom Of Speech Retaliation"). Seemingly before the masking incident, Spiehs protested at Lawrence High School. *Id.* at ¶ 69. He says that "Lewis was aware of Dr. Spiehs' daily protests" and thus "has continued to retaliate against the Plaintiff through current date for [a] one time violation of a mask requirement that no longer exists." *Id.* at ¶¶ 68–69.

The second cause of action alleges that Defendants violated the Equal Protection Clause of the Fourteenth Amendment. Doc. 50 at 31 (titling the claim this way). It offers rhetorical questions, such as "[i]f not wearing a mask … merits a lifetime ban from USD 497 property for Dr. Spiehs why not for his friend who did the same thing?" Doc. 50 at ¶ 126. Spiehs's friend is not the only subject of comparison; Spiehs claims others who had a different message were treated more favorably, too. *See e.g.*, *id.* at ¶ 138.

The third cause of action returns to the First Amendment. It alleges that Defendants violated Spieh's right to associate, freedom of speech, and freedom of religion. *See* Doc. 50 at 36 (captioning the third cause of action this way). As explained, Spiehs is subject to a no-trespass order that sweeps across all District property. *See id.* at ¶¶ 35, 61. That property is open to the public—and importantly, Spiehs says, it is open "to churches to conduct religious activities on Sundays." *Id.* at ¶ 147. Thus, the no-trespass order means that Spiehs, were he so inclined (and there is no indication he is, so this appears to be rhetorical), "is prohibited from associating with those parishioners, listening to [their] messages, or in participating in those religious exercises." *Id.* at ¶ 149.

The fourth cause of action alleges that "[t]he defendants have suppressed Spiehs's speech because of his prior and present viewpoints." Doc. 50 at ¶ 161. This cause of action largely repeats Spiehs's retaliation claim, his first cause of action. *Id.* at ¶ 166 ("Defendants restricted and punished Spiehs' views because they didn't like him and because of their respective specific motivating ideology, opinion, and perspective.").

The fifth cause of action seeks declaratory and injunctive relief. Doc. 50 at 46. It is an as applied challenge, so Spiehs argues that the

"Board's speaking policy has been applied to [him] in a discriminatory and disparate fashion." *Id.* at ¶ 192. In other words, Spiehs argues that the Board discriminates based on viewpoint. He also argues that "Defendants apply … requirements to [him] which are void, inconsistent, and vague." *Id.* at ¶ 215.

The sixth cause of action is a facial challenge. *Id.* at 58 (captioning the claim this way). It alleges that Defendants' policies are unconstitutionally vague. *Id.* at ¶¶ 227, 236, 242.

**2.** Defendants moved to dismiss these claims, Doc. 21; Doc. 24; Doc. 26; Doc. 28; Doc. 30; Doc. 51, and Spiehs moved for a preliminary injunction against the no-trespass order, Doc. 4. His motion for a preliminary injunction was denied at a March 2024 hearing, with an explanation to follow. Doc. 46. He voluntarily dismissed one set of defendants, Doc. 38, mooting their motion to dismiss, Doc. 24. He also amended his complaint, Doc. 50, replacing defendant Bob Byers with the Lawrence Kansas School District ("the Board"). That mooted Byers's motion to dismiss. Doc. 55. The Board picked up where Byers left off, filing its own motion to dismiss. Doc. 51. The four remaining motions to dismiss—Docs. 21, 26, 28, and 51—and Spiehs's motion for a preliminary injunction, Doc. 4, are addressed below.

## II

Defendants move to dismiss Spiehs's claims, each making substantially the same arguments. Defendants Donnell, Hill, and Lewis persuasively argue that Spiehs's fails to state a claim against them, so their motions are granted. But some of Spiehs's claims may proceed against the Board, so the Board's motion is denied in part.

## A

Each defendant argues that Spiehs's claims run into statute of limitations, mootness, and standing issues. They also correctly assert that he fails to state a claim, at least with respect to some arguments. The following addresses these common issues raised by the various defendants.

**1**

A two-year statute of limitations applies to Spieh's claims. He sued under 42 U.S.C. 1983, which lacks a statute of limitations of its own. *Hardin v. Straub*, 490 U.S. 536, 538 (1989). Instead, "[l]imitations periods in [Section] 1983 suits are to be determined by reference to the appropriate state statute of limitations." *Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006) (quoting *Hardin*, 490 U.S. at 539). In this context, that means the underlying state's statute of limitations for personal injury torts. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). Kansas has one, K.S.A. § 60-513, and it provides two years in which to sue. *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1172 (10th Cir. 2015). So Spiehs had two years to bring his claims after they accrued.

Accrual for a Section 1983 claim "is a question of federal law that is not resolved by reference to state law." *Wallace*, 549 U.S. at 388. And under federal law, a Section 1983 claim accrues when "the plaintiff can file suit and obtain relief." *Id.* (citation omitted); *see also Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998) (noting that Section 1983 claims alleging constitutional violations "accrue when the plaintiff knows or should know that his or her constitutional rights have been violated") (internal quotation marks omitted).

**a.** Many of Spiehs's claims accrued in October 2021, when Lewis banned him from District property. He knew or should have known that his constitutional rights were violated at that point. Yet he filed his complaint more than two years later. Doc. 50 at 70 (filing date of December 22, 2023). Since the statute of limitations started running when he was banned, he has waited too long to sue over the no-trespass order. *See Baker v. Bd. of Regents of Kan.*, 991 F.2d 628, 630 (10th Cir. 1993) (holding that K.S.A. § 60-513, which provides a two year statute of limitations, applies to Section 1983 claims); *Lewis v. Dodge City Cmty. Coll.*, No. 22-CV-3207, 2024 WL 896197, at *4 (D. Kan. Mar. 1, 2024) (applying K.S.A. § 60-513 to hold that the plaintiff's Section 1983 claims were time barred); *see also Jacobs v. Lyon Cnty. Det. Ctr.*, 371 F. App'x 910, 912 (10th Cir. 2010) (affirming the district court's determination that the plaintiff's 1983 action was time barred for similar reasons).

Spiehs says he did not wait too long, because he remains subject to the no-trespass order. *See* Doc. 50 at ¶ 61 ("You are correct; you are still not permitted to be on any USD 497 property…."). But he

was deprived of his rights, if at all, when Lewis and Lawrence Police first issued the order. That Spiehs continues to oppose the order or feel its impacts does not mean—as Spiehs argues—that "[e]ach day Dr. Spiehs is banned constitutes a new injury and continuing unlawful act," Doc. 34 at 1.

In other words, the continuing violation doctrine does not toll Spiehs's statute of limitations. *Contra* Doc. 34 at 1. "[T]he continuing violation doctrine applies when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act." *Herrera v. City of Espanola*, 32 F.4th 980, 993 (10th Cir. 2022) (citation and internal quotation marks omitted). The conduct at issue—issuance of the no-trespass order—is a discrete act. *Vasquez v. Davis*, 882 F.3d 1270, 1277 (10th Cir. 2018) (failure to treat medical condition was a discrete act even though it continued to cause damage). Spiehs disagrees, arguing that one can interpret the ban as a series of unlawful acts rather than a discrete act. But there is only one no-trespass order. True, the order may be enforced multiple times. But each time, Defendants must rely on the original order. Because the continuing violation doctrine "is triggered by continual unlawful acts, not by continual ill effects from [an] original violation," *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011), Spiehs cannot rely on the continuing violation doctrine to evade the statute of limitations. *Id.* at 1253 (concluding that the filing of a criminal complaint was at most a single unlawful act).

Nor does the "repeated violation doctrine" save Spiehs's claims. *Contra* Doc. 34 at 1. That doctrine "stands for the straightforward proposition that discrete [Section] 1983 violations occurring within the statute of limitations are actionable, even if claims for prior, similar violations are time barred." *Herrera*, 32 F.4th at 995. Naturally, then, it does not permit a plaintiff to rely on continuing harm from "a discrete act occurring within the statute of limitations period." *Id.* Spiehs does not describe discrete acts occurring within the statute of limitations period, at least with respect to the no-trespass order. Thus, neither doctrine tolls the statute of limitations. Spiehs must sue, if at all, over violations that occurred within two years of his suit. That does not include the issuance of the no-trespass order.

**b.** The statute of limitations issue dispenses with half of Spiehs's retaliation claim (first cause of action) and his omnibus claim about

church services (third cause of action).[3] Both arguments depend on the no-trespass order, Doc. 50 at 12, 36, but the time to sue over that order has passed.

This also frustrates Spiehs's motion for a preliminary injunction. Doc. 4. In that motion, he asked that "[t]he Court permanently enjoin the defendant Superintendent's and the Board's permanent ban of Dr. Spiehs from USD 497 property … If not then a preliminary injunction should issue." Doc. 4 at 10. This motion was denied at a hearing, Doc. 46, with an explanation to follow. This is that explanation: A preliminary injunction cannot issue because the statute of limitations forecloses Spiehs's challenges to the no-trespass order. He is therefore unable to show that he is "substantially likely to succeed on the merits of [his] claims." *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018)). That remains true even in light of the continuing and repeated violation doctrines, since neither applies to Spiehs's situation.

## 2

Spiehs's sixth cause of action argues that the Board's policies are unconstitutionally vague.[4] Doc. 37 at 1. This is a facial challenge, Doc. 50 at 46, 58, so Spiehs must show that the challenged policy "would be vague in the vast majority of its applications." *Dr. John's,*

---

[3] Even if the claim were not barred, Spiehs very likely lacks standing to assert his third cause of action. He says the no-trespass order would prevent him from attending church services on District property, Doc. 50 at ¶¶ 35, 72, 149, but never alleges that he has tried to attend those services. In other words, Spiehs fails to allege that he has an injury-in-fact because there appears to be no credible intention of engaging in conduct that is affected by this order. *See generally Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014) (describing ways in which a plaintiff could have standing to bring a pre-enforcement challenge).

[4] Spiehs twice hints at an overbreadth argument. Doc. 50 at ¶¶ 168, 242. Overbreadth and vagueness can be incompatible arguments, or they can fit within each other. *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005); *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Since Spiehs develops vagueness while tending to ignore overbreadth, the latter argument is not considered. He also references viewpoint discrimination arguments while discussing vagueness. Those references are considered in the context of his other viewpoint discrimination claim. *See* Section II.B.1, *infra*.

*Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006); *see also Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023) (comparing facial challenges with as-applied challenges). A rule is impermissibly vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023) (quoting *Hill v. Colorado.*, 530 U.S. 703, 732 (2000)). Spiehs does not state a plausible vagueness claim.

Spiehs first points to Board Policy BCBI. The BCBI policy refers to "comment on topics not included on the meeting agenda," "continued or egregious violations," "foul language," and "germane[ness]." Doc. 50 at ¶¶ 236–40. Spiehs offers ways to read each of these terms as ambiguous. *E.g.*, *id.* at ¶ 237 ("[T]hat speaking on this non-agenda topics now becomes the business of the board? Or does it mean that the speaker is not limited to talking about topics 'germane to the business of the board'?"). But none of his suggestions make the BCBI policy vague. The BCBI policy requires that comments be "germane." *See id.* It also requires that comments be included on the meeting agenda. *See id.* A person of ordinary intelligence can read these terms, especially together, and understand what comments are permitted. Courts have upheld far more ambiguous language against facial vagueness challenges. *See Harmon*, 61 F.4th at 798 ("loud or unusual"); *Dr. John's, Inc.*, 465 F.3d at 1158–59 ("significant or substantial"); *Kovacs v. Cooper*, 336 U.S. 77, 79 (1949) ("loud and raucous").

So too with "foul language" and "continued or egregious violations." Doc. 50 at ¶¶ 238–39. These terms are less abstract than other terms upheld against vagueness challenges. *See, e.g.*, *Harmon*, 61 F.4th at 798. And at any rate, both terms "have acquired sufficient meaning to put citizens of ordinary intelligence on notice" of what the policy governs. *Id.* Nor are citizens at risk of arbitrary and discriminatory enforcement. Enforcement flows from the Board's comprehensible standard. That the standard permits "some" discretion is not enough to render it unconstitutional. *See Dr. John's, Inc.*, 465 F.3d at 1158 (contrasting a valid policy that "gives officials some discretion" with "the sort of 'virtually complete discretion' that has formed the basis for facial vagueness attacks") (citation omitted).

Spiehs also refers, parenthetically, to "complaints" and "protect the privacy" as vague terms. *See* Doc. 36 at 7. Both terms appear in

the Board's "Public Comment Form," which repeats the BCBI policy language. Doc. 50 at ¶ 211. Neither term is vague. The first term, "complaints," commonly refers to "the act of complaining," the "utterance of pain, displeasure, annoyance … " and to "grievance[s]." Collins Dictionary Online (last visited Dec. 11, 2024), www.collinsdictionary.com/us/dictionary/english/complaint. This term is not ambiguous. Its meaning is plain to a person of ordinary intelligence. Of course, a policy against "complaints" may yet present a First Amendment problem; Spiehs's own viewpoint-discrimination claim relies on the term "complaints." Doc. 50 at ¶¶ 161–63, 252. But there is no vagueness problem. Spiehs knows what the term means, and concludes from that plain meaning that the term discriminates based on viewpoint. *See* Doc. 35 at 7; Doc. 37 at 1. That discrimination is not the product of unbridled discretion, *see Dr. John's, Inc.*, 465 F.3d at 1158, but is instead allegedly baked into the term itself. Put simply, if the term "complaints" leads the Board to violate the First Amendment, it is not because that term is vague. *See Wyo. Gun Owners*, 83 F.4th at 1233; *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (finding a criminal statute constitutionally problematic where it "contain[ed] no standard" and "vest[ed] virtually complete discretion in the hands of the police").

The second term, "protect the privacy," is not a substantive rule that could be applied against Spiehs. It is a reason behind the Board's substantive rule. *E.g.*, Doc. 50 at ¶ 248 ("If needed, the board president or presiding officer of the meeting may direct that a patron's comments be heard by the board in executive session in order to protect the privacy of the individuals to be discussed."). Thus, "protect the privacy" is not deployed to limit speech. It merely tries to justify the Board's limits on speech. Those limits might be invalid, but the Board's policy is not unconstitutionally vague because of the term "protect the privacy." Accordingly, Spiehs fails to plead a viable vagueness challenge.

**3**

One more point about the kind of relief that Spiehs can seek. His claims depend on various policies promulgated by the Board and enforced by Defendants. The policies govern public comments, including comments delivered through WebEx. Two such policies, Board Policy BCBI and Board Policy KN, were updated in June 2022 and November 2023, respectively. Doc. 31 at 2–3. The former policy governs communications with the Board; the latter governs com-

plaints made to the board. *Id.* Both were updated after Spiehs's last WebEx appearance (at least, the last appearance alleged in his complaint). Doc. 50 at ¶ 114.

The updated policies narrow Spiehs's ability to seek relief. To the extent that he seeks equitable relief based on the old BCBI and KN policies, his requests are moot. "A claim is moot when a plaintiff loses a personal stake in the outcome because of some intervening event." *Equal Emp. Opportunity Comm'n v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173 (10th Cir. 2017). Spiehs lost his stake in litigating the old policies because the Board changed them. That is, enjoining the old policies would have no effect because the Board no longer enforces them. *See CollegeAmerica Denver, Inc.*, 869 F.3d at 1173 ("In assessing mootness, we consider whether a favorable judicial decision would have some effect in the real world.").

Sometimes courts do not find that claims are moot under these circumstances, such as when a defendant voluntarily abandons allegedly unlawful conduct. *See CollegeAmerica Denver, Inc.*, 869 F.3d at 1173–74 (discussing "voluntary cessation"). But a case is nonetheless moot "if the possibility of recurrence of the challenged conduct is only a speculative contingency." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010) (citation, alterations, and internal quotation marks omitted). Spiehs does not offer a speculative contingency, *see generally* Doc. 34; Doc. 35; Doc. 36; Doc. 37, so his old-policy arguments are indeed moot. *See. Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241–44 (2024) (explaining that defendants cannot simply suspend their conduct and moot a case unless there is reason to believe that their conduct will not recur).

Spiehs cannot challenge the new policies, either. He does not allege that he was subject to them, or that enforcement is otherwise imminent, so he lacks standing to attack them. *See generally* Doc. 50; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014).

## B

Not all of Spiehs's claims are clearly implausible. Those that remain are considered below—first as asserted against the Board, and then as asserted against the three individual defendants.

**1**

One of the remaining defendants is the Board itself. Doc. 50 at ¶ 12. It can be liable only if it caused Spiehs's alleged deprivations through an official policy or custom. *See Monell*, 436 U.S. at 690–91. Spiehs has pled sufficient facts along those lines. He says his WebEx connection was terminated by the Board president. Doc. 50 at ¶ 216. She allegedly did so while following policies adopted by the Board. *Id.* at ¶ 230. That is enough, at this stage, to support the argument that "execution of a government's policy or custom" caused Spiehs's alleged injuries. *See Monell*, 436 U.S. at 694. So Spiehs's suit proceeds against the Board.

That said, the Board also disputes Spiehs's arguments on the merits. *See generally* Doc. 52. Those arguments, at least as disputed by the Board, are considered below.

**a**

The surviving half of Spiehs's retaliation claim[5] argues that Defendants retaliated against him when they removed him from several WebEx meetings. Spiehs was ejected from three such meetings: one in February 2022 and two in April 2022. Doc. 50 at ¶¶ 92, 101, 109. These meetings occurred within two years of his complaint, so the statute of limitations is not an obstacle. And at this stage, he states a claim for retaliation.

To state a First Amendment retaliation claim, Spiehs must show three things. One, that he "was engaged in constitutionally protected activity." *Irizarry v. Yehia*, 38 F.4th 1282, 1288 (10th Cir. 2022) (quoting *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)). Two, that

---

[5] "Surviving half" because most of his retaliation arguments focus on the masking dispute and are thus not viable. Doc. 34 at 11–12; Doc. 35 at 4 ("Webex was retaliatory and was not an alternative forum."); Doc. 36 at 3 (implying that "forever banishment to the virtual world of meetings via WebEx" is retaliation for the mask dispute); Doc. 37 at 10–11. Those arguments are not viable because the masking dispute is beyond the statute of limitations. Section II.A.1, *supra*. Spiehs also references a protest from July 2021 in which he was allegedly "almost … run over by Defendant Lewis while protesting." Doc. 37 at 11. That incident is beyond the statute of limitations, too, since any protected conduct and retaliatory response occurred together, in July 2021. *See* Section II.A.1, *supra*.

"the defendant's actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Id.* And three, that "the defendant's adverse action was substantially motivated as a response to [his] exercise of constitutionally protected conduct." *Id.* Usually, these claims arise in the employment context "when an employee engages in protected speech and is later punished through separate adverse action, such [as] demotion or termination." *Gilmore v. Beveridge*, No. 2:22-CV-02032, 2023 WL 4104579, at *7 (D. Kan. June 21, 2023). Spiehs was not an employee, so he was not demoted or terminated. Instead, he sketches a retaliation claim in which restrictions on his speech are themselves retaliation. *See, e.g.*, Doc. 50 at ¶ 100 ("The board retaliated against Dr. Spiehs by stopping [his] speech….").

Spiehs's sketch could be sufficient, assuming that retaliation can overlap with viewpoint discrimination. *Irizarry v. Yehia*, 38 F.4th 1282, 1292 (10th Cir. 2022) (shining a light into a camera was "injury…that would chill a person of ordinary firmnesss from continuing to film") (internal quotation marks omitted); *but see Gilmore*, 2023 WL 4104579, at *7 ("It seems that the alleged retaliatory action supporting a First Amendment retaliation claim cannot be the simple fact of prohibiting the initial speech at issue."). He said he was engaged in constitutionally protected activity, specifically: "[t]he board retaliated against [him] by stopping [his] speech…." Doc. 50 at ¶ 100. Like in *Irizarry*, Defendants allegedly retaliated by cutting off his speech. 38 F.4th at 1292. He pled that Defendants did so using a speech-related policy, Doc. 50 at ¶ 114, so their conduct could have been motivated by the protected speech. And interfering with speech, as in *Irizarry*, often chills it. 38 F.4th at 1292–93 (noting that the officer made "it difficult if not impossible to continue recording a potentially critical moment"). This is an objective test, *id.* at 1292, so it does not matter that Spiehs continued to show up to meetings, *contra* Doc. 31 at 12.

Yes, Spiehs's argument is threadbare. He often concludes a point without connecting fact to argument. *See* Doc. 37 at 11 (offering that the disputed activity "was retaliatory and caused Dr. Spiehs to suffer an injury because of his protected activities that would chill a person of ordinary firmness from continuing to engage in that activity"). He also appears to acknowledge that the retaliation claim is coextensive with his viewpoint discrimination claim. *E.g.*, Doc. 34 at 11–12. Nonetheless, Spiehs pled a facially plausible retaliation claim. As a

result, that claim cannot be dismissed as inadequately pled. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

**b**

Spiehs has two viewpoint discrimination claims that make roughly identical arguments. *See* Doc. 37 at 1 (acknowledging that the fourth and fifth causes of action both raise a viewpoint discrimination issue). Spiehs also has an Equal Protection argument. *See* Doc. 50 at ¶ 126 (describing Spiehs's second cause of action). He blends the Equal Protection argument with his various First Amendment arguments. *Id.* at ¶¶ 134, 144. In this context, the three arguments are indeed fused: the government has no rational reason to treat Spiehs differently from others if it does so solely because of what he says. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 n.4 (1992). Accordingly, the viewpoint discrimination arguments rise and fall together. *See Gilmore v. Beveridge*, No. 222CV02032, 2022 WL 17082681, at *8 (D. Kan. Nov. 18, 2022) (reaching a similar conclusion with similar claims).

Consider the substance of Spiehs's viewpoint discrimination theory, then. Spiehs argues that the Board set up a limited public forum for "ostensibly free and fair discussion." Doc. 50 at ¶ 189. It then protected this forum not through valid content-based rules, but through invalid viewpoint-based ones. *See id.*

Three analytical steps comprise the relevant First Amendment inquiry. A court must determine whether Spiehs's speech is protected, the sort of "forum" in which he wants to speak, and "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). There is no serious dispute that Spiehs's speech is protected, *see* Doc. 31 at 11, or that the Board's meetings are limited public forums, *see id.* at 9; Doc. 50 at ¶ 188. So the only question is whether the Board properly excluded Spiehs from its limited public forum. *See Gilmore v. Beveridge*, No. 222CV02032, 2022 WL 3139023, at *5 (D. Kan. Aug. 5, 2022) (considering a similar school board speech claim).

A limited public forum may be confined "to the limited and legitimate purposes for which it was created." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). One may be created for certain speakers, certain topics, or both. *See Shero v. City of Grove*, 510

16

F.3d 1196, 1202–03 (10th Cir. 2007). By definition, then, a limited public forum imposes content-based limits. These limits must be viewpoint neutral and "reasonable in light of the purposes served by the forum." *Rosenberger*, 515 U.S. at 829. So limited, speech in a forum may be subject to further "time, place, and manner" restrictions. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes…."); *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 132 (1981). Such restrictions must be narrowly tailored to serve a significant government interest. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). They must also "leave open ample alternative channels for communication" and be "justified without reference to the content of the regulated speech." *Id.*

The Board says it restricts topics, not viewpoints. As it explains, "[w]hen Plaintiff began making complaints about specific students or staff during comments to the board via WebEx … he was reminded by [the] board president that those were not proper topics for comment." Doc. 31 at 3. Spiehs nonetheless "continued to comment on those topics," so his WebEx connection was terminated. *See id.* The Board refers to "topics," but a complaint is not a topic; it is a viewpoint about a topic. Collins Dictionary Online (last visited Dec. 12, 2024), https://www.collinsdictionary.com/us/dictionary/-english/complaint (defining "complaint" as "the act of complaining; utterance of pain, displeasure, annoyance, etc." and as a "grievance"). "Students or staff" might be a topic, but Defendants can only govern that topic in a viewpoint-neutral manner. By excluding only "complaints," they fail to do so. Other courts to consider the same issue agree. *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1181 (D.N.M. 2014); *Leventhal v. Vista Unified Sch. Dist.*, 973 F. Supp. 951, 957 (S.D. Cal. 1997) (concluding that a district bylaw prohibiting public criticism of District employees was content-based); *see also Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787, at *9 n.6 (10th Cir. Dec. 27, 2022) (distinguishing *Leventhal* because the *Leventhal* rule "allowed neutral views but prohibited negative views" whereas "here, as discussed, the personnel-matter restriction itself is viewpoint neutral"); *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972) ("Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say."). As one such court put it, "[i]t is difficult to imagine a more content-based prohibition on speech than [a] policy,

which allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on a particular subject matter (District employees' conduct or performance)." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 730 (C.D. Cal. 1996).

Nor would the Board's policy necessarily work as a time-place-manner restriction, because it is not clearly "justified without reference to the content" of speech. *Cmty. for Creative Non-Violence*, 468 U.S. at 293. The policy shunts complaints about staff and students to the Board's "executive session" so that it can "protect the privacy of the individuals to be discussed." Doc. 50 at ¶ 203. An interest in the "privacy of the individuals to be discussed" is an interest in content, especially when the Board cares about negative publicity but not positive publicity. And it is no answer to say that individuals (or Board members) may react poorly when discussed at a meeting. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (citation omitted) ("Nor under our Constitution does protected speech … readily give way to a 'heckler's veto.'"). The Board may restrict the time, place, and manner of speech. But it cannot do so for complaints simply because they are complaints. *See id.*

Accordingly, Spiehs may succeed in proving that the Board's policies are content-based. If they are, they are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). To survive strict scrutiny, the Board would have to prove that its policies are "narrowly tailored to serve compelling state interests." *Id.* at 163; *see also Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1232 (10th Cir. 2021) (subjecting a law that discriminated on the basis of viewpoint to strict scrutiny).

Some cases have upheld policies that look a lot like the Board's policy, but those cases are both distinguishable and not binding. For example, the school district in *Lowery* restricted "harassing" speech because it wanted to use its time efficiently. *See Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 435 (6th Cir. 2009) (referencing other content-neutral justifications for the same policy). The Sixth Circuit upheld that policy. *Id.* It still noted, though, that a "board may not exclude speech merely because it criticizes school officials." *Id.* Spiehs pled that the Board excludes speech on that basis. *See* Doc. 50 at ¶¶ 161–62, 203.

The same thing is true of *Pollak*, 2022 WL 17958787, at *7. That case examined a policy stating that "[p]ersonnel matters are not appropriate topics to be discussed at regular board meetings." *Id.* The Tenth Circuit found the policy viewpoint neutral because it prohibited "discussion of a subject—personnel matters—but [did] not draw a distinction based on viewpoint." *Id.* And it did not matter that the chair of the Board believed only "favorable personnel speech was allowed." *Id.* Her views were not school-board policy, so they could not support a facial challenge. In Spiehs's case, the policy both suggests a viewpoint-based category ("complaints") and was allegedly applied to suppress that viewpoint. Doc. 50 at ¶ 161; *see also id.* at ¶ 216. *Pollak*, even if it were binding, does not fit the facts of his case.

One case in this district denied a preliminary injunction against a nearly identical policy, as Defendants note. Doc. 29 at 10 (citing *Gilmore v. Beveridge*, No. 222CV02032, 2022 WL 3139023, at *7–9 (D. Kan. Aug. 5, 2022)); Doc. 31 at 10 (same); Doc. 27 at 11 (same); Doc. 22 at 10 (same). In that case, "the school board['s policy] 'requests' or 'may request' that complaints about students or staff be addressed administratively first." That is also true of Defendants' policy. Doc. 50 at 1 n.1. But several things limit *Gilmore*'s ability to persuade. In *Gilmore*, a school board member "testified that a speaker could ignore the request and continue speaking." 2022 WL 3139023, at *7. That is not true in Spiehs's case. The Board seems to interpret its policy as a prohibition, not a request. *See* Doc. 31 at 13–14. Nor could Spiehs "ignore the request and continue speaking," *cf. Gilmore*, 2022 WL 3139023, at *7, since "his WebEx connection was terminated," Doc. 31 at 3. Although the *Gilmore* court found a similar policy "facially reasonable and viewpoint neutral," that policy is not identical to the one allegedly applied to Spiehs. Moreover, the *Gilmore* court later found it plausible that the challenged policy was applied to discriminate on the basis of viewpoint. *Gilmore v. Beveridge*, No. 2:22-CV-02032, 2023 WL 4104579, at *6 (D. Kan. June 21, 2023). Ultimately, then, Spiehs has pled a viable viewpoint discrimination claim based on his WebEx activity.

### 2

Finally, consider how Spiehs's surviving claims apply to the three individual defendants left in this case: Alyse Donnell, Erica Hill, and Anthony Lewis. Spiehs can only seek damages from them, since his requests for injunctive relief are not viable. And for the following reasons, each of their motions to dismiss is granted.

a

Section 1983 plaintiffs must allege that a defendant personally participated in denying them their rights—in other words, they must "make clear exactly *who* is alleged to have done *what* to *whom*." *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (citation omitted) (emphasis in original). Spiehs does not do this with respect to defendant Alyse Donnell, so his claims against her are dismissed.

Donnell "is Clerk of the Lawrence Board of Education and is also the Assistant to Superintendent Lewis." Doc. 50 at ¶ 6. Spiehs explains that "in 2022, [she] provided [a] form to individuals seeking to make public comments at open meetings conducted by the Lawrence School Board." Doc. 50 at ¶ 30. And she was copied on Lewis's December 2023 email confirming that Spiehs is still subject to the no-trespass order. Doc. 50 at ¶ 61. That is all Spieh's alleges with respect to Donnell.

Without more, Spiehs has not pled that Donnell was personally involved in the alleged violations. He argues that "Donnell doesn't argue that her actions are not state actions." Doc. 36 at 2. But it is his burden to establish—not Donnell's burden to disprove—personal participation. *See Iqbal*, 556 U.S. at 663. It is insufficient for Spiehs to fall back on an "undifferentiated contention that 'defendants' infringed his rights," *Pahls*, 718 F.3d at 1226, or impute other defendants' actions to Donnell simply because she works alongside them. *Iqbal*, 556 U.S. at 676. But Spiehs often tries to do both of these things, arguing about Donnell's "various key roles," implying a "symbiotic relationship" between Donnell and the other defendants, and then simply arguing about "Defendants[']" conduct rather than Donnell's conduct. *See* Doc. 36 at 2–4. These allegations are seemingly made for the first time in Spiehs's response to Donnell's motion. *See generally id.*; Doc. 50. Obviously that will not do. *See Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) (collecting cases recognizing a response brief may not be used to amend a complaint); *see also Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1189 (10th Cir. 2012) (explaining that federal courts are limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint). But even if the complaint included an allegation that Donnell played "various key roles," that would still be insufficient. *See Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005) (explaining that a defendant cannot be held liable under Section 1983 unless they personally participated in the state action). Because Spiehs did not plead

Donnell's personal participation in any alleged deprivation of his rights, he fails to state a claim against her.

**b**

Erica Hill is the former Board President. Doc. 50 at ¶ 13. Spiehs alleges that she "interprets the Board's public comment restrictions" as forbidding "negative[ ] comment[s] about students or staff." Doc. 50 at ¶ 134. Likewise, he says "Hill interprets [a] reference to 'privacy' [in one of the Board's public-comment policies] as justifying the limitation and termination of Dr. Spiehs' speech." *Id.* at 214. Hill allegedly enforced these views while suppressing Spiehs's speech. *See id.* at ¶¶ 161, 214, 216, 221, 250. She did so by repeatedly terminating his WebEx connections—choices that he says "constitute[ ] an act of official government policy of the Board." *Id.* at ¶ 230. These allegations support Hill's personal participation. *See Pahls*, 718 F.3d at 1225.

Personal participation is merely one requirement, though. Recall Spiehs's surviving theories of liability: retaliation, viewpoint discrimination, and denial of equal protection. *See* Section II.B.1., *supra*. Across these theories, he argues that Hill violated his rights when she enforced the Board's policies against him. *E.g.*, Doc. 50 at ¶ 216. Those allegations could establish Hill's personal participation. Even so, she did not violate clearly established law and is thus entitled to qualified immunity.

A qualified immunity defense is appropriate in a motion to dismiss for failure to state a claim. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). At this stage, the facts as pled in the complaint must describe conduct that violates the Constitution or laws of the United States. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Even if they do, the law must have been clearly established at the time of the alleged conduct such that the defendant had fair notice that his or her conduct was unlawful. *See Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). If both inquiries are answered in the affirmative, the motion to dismiss must be denied. But if the answer to either is no, the defendant is entitled to judgment as a matter of law. *Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023). Courts have discretion to address the inquiries in any order. *al-Kidd*, 563 U.S. at 735 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)); *accord Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Discerning whether the relevant legal rule was clearly established is a narrow and context-specific exercise. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam). The precise contours of the legal right must have been so clear that every reasonable official in that circumstance would have understood what he or she was doing violated that right, leaving no debate as to the lawfulness of the conduct. *See Mullenix v. Luna*, 577 U.S. 7, 13–14 (2015); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *al-Kidd*, 563 U.S. at 740; *see also Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–8 (2021) (reversing a denial of qualified immunity where the precedent relied upon had "materially distinguishable" facts such that it "did not give fair notice" to the official). Practically, this means a "Supreme Court or Tenth Circuit decision" must have held that the same conduct (or very nearly the same conduct) as the conduct at issue violates the law. *Wise v. Caffey*, 72 F.4th 1199, 1209 (10th Cir. 2023).[6] When it is debatable whether a violation has occurred in the circumstances at issue, the law cannot, by definition, be clearly established. *See Reichle*, 566 U.S. at 669–70; *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (reversing the Tenth Circuit for denying qualified immunity where the precedent did not make it clear to an officer that the specific conduct at issue was unlawful).

Hill could have violated Spiehs's rights. As explained above, she needs a better justification than "privacy"—and a more neutral limit than "complaints"—to pass First Amendment muster. *See* Section II.B.2, *supra*. If she in fact applied a policy to suppress complaints simply because they are complaints, she could have violated the First Amendment. Nonetheless, that was not clear from Tenth Circuit or Supreme Court precedent. *See City of Renton v. Playtime Theatres, Inc.*,

---

[6] The Supreme Court has never held that circuit precedent may be a dispositive source of clearly established law, opting instead to assume without deciding that it might. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citing *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 614 (2015), which cited *Carroll v. Carman*, 574 U.S. 13, 17 (2014), which, in turn, cited *Reichle v. Howards*, 566 U.S. at 665–66); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). But the Tenth Circuit has, holding that a "constitutional right is clearly established when a Tenth Circuit precedent is on point, making the constitutional violation apparent." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017).

475 U.S. 41, 52 (1986) (discussing valid regulations aimed at the "secondary effects" of speech); *Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787, at \*2 (10th Cir. Dec. 27, 2022) (reasoning that an analogous policy did not discriminate on the basis of viewpoint under Tenth Circuit precedent). Spiehs responds with cases from other circuits, Doc. 35 at 3 (citing *Gerlich v. Leath*, 861 F.3d 697, 709 (8th Cir. 2017)), and cases that speak to general principles, *id.* (citing *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 281 (1984)). These general, non-binding decisions are insufficient. *See Bond*, 595 U.S. at 12 (requiring binding precedent). Spiehs must offer more to meet his burden to defeat qualified immunity for Hill. He does not.

In other words, no precedent gave Hill fair notice that her conduct was unlawful, *see Wesby*, 583 U.S. at 63, entitling her to qualified immunity from damages. Spiehs has only damages claims at this point, so this conclusion dispenses with all of his claims against Hill.

**c**

The story is similar with Anthony Lewis. Lewis is the Board's superintendent. Doc. 50 at ¶ 5. He was involved in the WebEx controversy in much the same way that Hill was involved. And like Hill, he has qualified immunity against both the retaliation and viewpoint discrimination claims.

Spiehs pled that Lewis "gestured to the defendant Board President with his hand indicating that Dr. Spiehs should be silenced or disconnected." Doc. 50 at ¶ 110 (describing the second WebEx meeting in April). Thus, Spiehs implies, Lewis applied "the KN policy." *Id.* at ¶ 137; *see also id.* at ¶ 204. The rest of Spiehs's allegations about Lewis pertain to the masking incident and no-trespass order—allegations which, as explained, are barred by the statute of limitations. Section II.A.1, *supra*. But Spiehs also appears to indict Lewis alongside Hill in the context of at least one WebEx meeting.

And like Hill, Lewis has qualified immunity from civil damages flowing from that alleged violation. Lewis's role is vanishingly small: he prompted Hill, and Hill arguably interpreted that prompt when she terminated Spiehs's WebEx connection. Assuming these allegations are sufficiently robust, *cf. Pahls*, 718 F.3d at 1225, they do not state a violation of clearly established law. Like Hill, Lewis had no reason to know that the Board policy discriminated on the basis of viewpoint. Courts still grapple with the question whether "com-

plaint" policies comply with the First Amendment. *Compare Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1188 (D.N.M. 2014) (concluding that a policy was viewpoint-based because "it allows praise but not criticism of the Governing Body and its employees") *with Scroggins v. City of Topeka*, 2 F. Supp. 2d 1362, 1372 (D. Kan. 1998) ("[I]t appears that the Council's Rule … prohibiting 'personal, rude or slanderous remarks' is content-neutral."). More importantly, no Tenth Circuit or Supreme Court decision makes clear that signaling to Hill would violate the First Amendment in these circumstances. So Lewis, like Hill, has qualified immunity from Spiehs's remaining damages claims. Those claims are all Spiehs has left, so none of his claims against Lewis are viable.

## III

For the foregoing reasons, Donnell's Motion to Dismiss, Doc. 21, is GRANTED. Hill's Motion to Dismiss, Doc. 26, and Lewis's Motion to Dismiss, Doc. 28, are also GRANTED. The Board's Motion to Dismiss, Doc. 51, is GRANTED IN PART and DENIED IN PART.

It is so ordered.

Date: December 13, 2024          s/ Toby Crouse
                                 Toby Crouse
                                 United States District Judge